# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA

_____
                                                    :
UNITED STATES OF AMERICA,             :            No. CR 01-3047– MWB
                                                    :
            Respondent,             :     **CAPITAL 2255 PROCEEDINGS**
                                                    :
        -v-                          :        HON. MARK W. BENNETT
                                                    :                   U.S.D.J.
DUSTIN LEE HONKEN,                       :
                                                    :
            Petitioner.              :
_____    :

### PETITIONER'S MOTION FOR RELIEF PURSUANT TO
### 28 U.S.C. SECTION 2255
### OR IN THE ALTERNATIVE
### PURSUANT TO 28 U.S.C. SECTION 2241

Leigh Skipper
Chief Federal Defender
By: Michael Wiseman
Chief, Capital Habeas Corpus Unit
Shawn Nolan
Supervising Assistant Federal Defender
Timothy Kane
Assistant Federal Defender
Federal Community Defender Office
Eastern District of Pennsylvania
Capital Habeas Corpus Unit
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520
Counsel for Petitioner
Dustin Lee Honken

Dated:    Philadelphia, PA
              December 13, 2010

## TABLE OF CONTENTS

Preliminary Statement and Relevant Procedural History. . . . . . . . . . . . . . . . . . . . . 1

Statement Regarding Briefing and Legal Argument.. . . . . . . . . . . . . . . . . . . . . . . 3

Statement Regarding Scope of this Petition and
Amendment of Claims.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Grounds for Relief.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Jurisdiction and Authority to Grant Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Claims for Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Claim One**
Petitioner's Rights to Due Process, Trial by Jury, Confrontation,
Compulsory Process, and Against Cruel and Unusual Punishment Were
Violated When Trial Counsel Provided Ineffective Assistance by Failing
to Object to the Admission of the Court's Sentencing Findings in a Prior
Case; Appellate Counsel Likewise Provided Ineffective Assistance by
Failing to Raise and Litigate the Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Claim Two**
Petitioner's Rights to Effective Trial and Appellate Counsel, Due
Process, and Against Double Jeopardy and Cruel and Unusual
Punishment Were Violated When Trial Counsel Failed to Object to the
Admission of Evidence Related to Issues Previously Litigated and
Resolved in Petitioner's Favor in His 1998 Drug Conspiracy Sentencing
Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

**Claim Three**
The Government Violated Due Process When it Failed to Disclose
Exculpatory Evidence Relevant to Cooperating Witnesses. Trial
Counsel Ineffectively Failed to Discover this Evidence. Accordingly,
Petitioner's Convictions and Sentences Violated the Fifth, Sixth and
Eighth Amendments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

i

**Claim Four**

Petitioner's Convictions and Sentences Resulting from His Convictions for Violation of 21 U.S.C. § 848(c) (Continuing Criminal Enterprise) were Obtained in Violation of the Fifth, Sixth and Eighth Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**Claim Five**

Petitioner's Rights to Effective Assistance of Counsel, Due Process, and Against Double Jeopardy and Cruel and Unusual Punishment Were Violated When Trial Counsel Failed to Object to Multiplicitous Charges for Drug Conspiracy Murder and Continuing Criminal Conspiracy Murder, in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**Claim Six**

Petitioner's Rights Under the Fifth, Sixth and Eighth Amendments Were Violated When Trial Counsel Ineffectively Failed to Object to the Admission of Hearsay Evidence Regarding the Quantity of Drugs Alleged in the Superceding Indictment; Appellate Counsel Ineffectively Failed to Raise and Litigate this Issue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**Claim Seven**

Petitioner's Rights to Due Process, to an Impartial Jury, to Effective Assistance of Counsel, and Against Cruel and Unusual Punishment Were Violated Where Trial Counsel Failed to Object to the Exclusion of Qualified Jurors from the Venire, Contrary to Witherspoon V. Illinois and its Progeny; Appellate Counsel Were Ineffective for Failing to Raise and Litigate this Issue; All in Violation of the Fifth, Sixth, and Eighth Amendments to the United States Constitution. . . . . . . . . . . . . . . . . . . . . . . 33

**Claim Eight**

The Systemic Exclusion And/or Under-Representation from the Jury Pool of African Americans, Latinos and Other Minority Groups Violated Petitioner's Rights under the Fifth, Sixth and Eighth Amendments. Counsel Ineffectively Failed to Litigate Challenges to this Unconstitutional System for Summoning Venire Persons. . . . . . . . . . . . . . 39

**Claim Nine**

Petitioner Was Denied His Sixth Amendment Right to Effective Assistance of Counsel at His Capital Sentencing. . . . . . . . . . . . . . . . . . . . . . . 43

**Claim Ten**

The Court's Penalty Phase Instructions Failed to Properly Narrow the Scope of the Jury's Consideration of Future Dangerousness and Failed to Guide the Jury's Weighing of Aggravating and Mitigating Circumstances; Counsel Were Ineffective for Failing to Object in Violation of Petitioner's Fifth, Sixth, and Eighth Amendment Rights. . . . 56

**Claim Eleven**

Victim Impact Evidence Presented to the Jury Was Received in Violation of the Fifth, Sixth and Eighth Amendments. . . . . . . . . . . . . . . . 58

**Claim Twelve**

The Government Violated Petitioner's Rights under the Eighth Amendment and the Due Process Clause by Presenting Inconsistent Arguments at His Trial and His Co-Defendant's Trial; Counsel Were Ineffective under the Sixth Amendment for Failing to Discover and Present Readily Available Evidence that Was Presented by the Government at his Co-defendant's Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . 64

**Claim Thirteen**

Trial Counsel's Stipulation to the Circumstances Regarding the Alleged Acquisition of Maps Allegedly Generated by Angela Johnson in Lieu of Testimony from Robert McNeese, Violated the Fifth and Sixth Amendments. Appellate Counsel's Failure to Raise Claims Related to the Stipulation was Ineffective. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

**Claim Fourteen**

The Government Violated the Fifth Amendment When it Repeatedly Elicited Inadmissible Testimony Regarding Petitioner's Alleged Involvement with Drugs and Violence That Was Too Remote to be Relevant. Trial and Appellate Counsel Ineffectively Failed to Object to or Litigate All of the Instances of Misconduct. . . . . . . . . . . . . . . . . . . . . . . 75

**Claim Fifteen**

Petitioner Was Denied His Rights to Due Process, a Fair Trial and the Effective Assistance of Counsel Where the Jury Heard Inadmissible Evidence of Petitioner's Prior Bad Acts and the Trial Court Failed to Give the Jury a Cautionary Instruction Concerning That Evidence.. . . . . . 79

**Claim Sixteen**

Trial Counsel Ineffectively Failed to Present Abundant, Readily Available Evidence that Would Have Supported their Theory of Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

**Claim Seventeen**

Petitioner Was Deprived of His Fifth, Sixth and Eighth Amendment Rights to Trial by an Impartial Jury and Due Process When the Trial Court Dismissed a Juror During Penalty Phase Deliberations but Upheld the Guilt Phase Verdict. Trial and Appellate Counsel Ineffectively Litigated these Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

**Claim Eighteen**

The Security Measures Used by this Court During Trial Denied Petitioner His Rights to a Jury Trial, to the Presumption of Innocence, Due Process, the Effective Assistance of Counsel and to Be Free of Cruel and Unusual Punishment as Guaranteed by the Fifth, Sixth and Eighth Amendments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

**Claim Nineteen**

Counsel Were Ineffective under the Sixth Amendment for Failing to Properly Litigate the Government's Use of Pseudo-Scientific Forensic Expert Testimony; in the Alternative, New Evidence Establishes That Petitioner Was Convicted and Sentenced to Death on the Basis of Inaccurate and Unreliable Expert Testimony in Violation of the Eighth Amendment and the Due Process Clause. . . . . . . . . . . . . . . . . . . . . . . . . . . 99

**Claim Twenty**

Petitioner is Entitled to Relief Based Upon the Cumulative Impact of the Constitutional Violations Described in this Motion.. . . . . . . . . . . . . . . . . 101

iv

**Claim Twenty-One**

The Manner in Which the Government Would Carry Out Petitioner's
Execution Would Violate the Eighth Amendment. . . . . . . . . . . . . . . . . . . 102

**Request for Relief**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

v

Petitioner, Dustin Lee Honken, was charged and convicted by a jury in 2004 of the following 17 counts contained in a superseding indictment: five counts of witness tampering, one count of soliciting the murder of a witness, one count of conspiracy to tamper with witnesses and to solicit the murder of witnesses, five counts of conspiracy to commit murder while engaging in the manufacture and distribution of methamphetamine (drug conspiracy murder), and five counts of Continuing Criminal Enterprise (CCE) murder. These convictions arose from an alleged scheme to eliminate witnesses to a prior (1993) drug indictment.

Following a separate penalty hearing, the jury voted to impose, on both the drug conspiracy and CCE murder counts, the death penalty for the murder of the children and life imprisonment for the adults' murders. On October 11, 2005, this Court formally imposed two sentences of death for each of the children's murders, life imprisonment for the adults' murders, and terms of imprisonment for the remaining counts.

The United States Court of Appeals for the Eighth Circuit affirmed the convictions and sentences, including the four death sentences. *United States v. Honken*, 541 F.3d 1146 (8th Cir. 2008), *Rehearing and Rehearing En Banc Denied*

January 7, 2009. The United States Supreme Court denied certiorari. *Honken v. United States*, 130 S.Ct. 1011 (December 14, 2009).

On September 16, 2009, upon motion by direct appeal counsel, Jean Barrett, the Court appointed the Capital Habeas Corpus Unit of the Federal Public Defender for the District of Arizona (Arizona CHU) as section 2255 counsel. (Dkt. # 784). On May 20, 2010, the Court granted the Arizona CHU's motion to withdraw due to a conflict of interest. (Dkt. #s 788, 789).

Undersigned counsel sought appointment as replacement counsel and that motion was granted on May 25, 2010. (Dkt. #s 790, 791).

Mr. Honken was represented by assigned counsel at trial, Alfredo Parrish, Leon F. Spies and Charles M. Rogers (learned counsel). The Government was represented by C.J. Williams and Thomas Henry Miller.

Mr. Honken was represented on direct appeal by Jean deSales Barrett, Gary E. Brotherton, and Monica Foster. The Government was represented by Mr. Williams.

Mr. Honken is incarcerated at the United States Penitentiary at Terre Haute, Indiana, Register # 06951-029.

In this *Motion*, Mr. Honken moves to set aside his convictions and sentences, including his death sentences, as having been obtained in violation of the United States Constitution and federal law in multiple respects.

References to sequentially numbered pages of the transcript of the trial proceedings before this Court are cited as "Tr." followed by a page citation. Transcripts of other proceedings are cited either as "Tr." and are followed by the date of the proceeding and a page number, or as "Johnson Tr." followed by a page citation to co-defendant Johnson's trial transcripts.

Dustin Lee Honken will be referred to by name, or as Petitioner. The United States will be referred to as the Government.

All other citations are either self-explanatory or are explained. All emphasis is provided unless otherwise noted.

### STATEMENT REGARDING BRIEFING AND LEGAL ARGUMENT

In accordance with Rule 2 of the RULES ON MOTION ATTACKING SENTENCE UNDER SECTION 2255, the *Motion* sets forth only the facts and grounds entitling Mr. Honken to relief. It does not contain legal argument or citations.

### STATEMENT REGARDING SCOPE OF THIS PETITION AND AMENDMENT OF CLAIMS

On November 29, 2010, Petitioner filed a motion seeking to extend the time he has to investigate the claims that are set forth herein and to add additional claims, subject to any time bar objections that may be raised by the Government. Petitioner sought this relief because current counsel have had only about five months to

3

investigate and research this *Motion*, in what by any standard would be viewed as a highly complex case.

Petitioner appreciates that the Government did not oppose this motion, and the Court granted it in part. Under the Court's order (Dkt. # 797), Petitioner will have until June 1, 2011, to file such amendments to the *Motion*, along with supporting documents, exhibits or other evidence. The Court also has scheduled a five day evidentiary hearing on Petitioner's claims to commence on October 31, 2011.

Undersigned counsel have worked diligently during this truncated time frame to ascertain those grounds for relief that are contained in this *Motion*. Counsel have made factual allegations that they know to be true, or reasonably believe to be true. As counsel continue their investigation, they will correct inaccuracies – if any – in the facts pled herein, and of course will add support for each of the grounds for relief asserted.

## GROUNDS FOR RELIEF

Petitioner herein alleges that his convictions and death sentences were obtained in violation of his rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution. These violations include deprivations of Petitioner's rights to effective assistance of counsel, due process of law, and to be free of cruel and unusual punishment.

4

Petitioner moves for relief pursuant to 28 U.S.C. § 2255. However, should it be determined that any of Petitioner's claims are not cognizable under § 2255, he alternatively moves for relief pursuant to 28 U.S.C. § 2241,which is an instrument for relief as to any claim for which § 2255 is not an effective or adequate mechanism to test the legality of his detention and sentence.

### JURISDICTION AND AUTHORITY TO GRANT RELIEF

This Court has jurisdiction to entertain this *Motion* and to provide the relief requested herein pursuant to 28 U.S.C. § 2255, 28 U.S.C. § 2241, and the RULES ON MOTIONS ATTACKING SENTENCE UNDER SECTION 2255.

### CLAIMS FOR RELIEF

### CLAIM ONE

**PETITIONER'S RIGHTS TO DUE PROCESS, TRIAL BY JURY, CONFRONTATION, COMPULSORY PROCESS, AND AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO OBJECT TO THE ADMISSION OF THE COURT'S SENTENCING FINDINGS IN A PRIOR CASE; APPELLATE COUNSEL LIKEWISE PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO RAISE AND LITIGATE THE ISSUE.**

At trial, the Government published to the jury, presented testimony about, and made arguments based on exhibits containing the sentencing findings of this Court in case CR96-3004-001-MWB. *See, e.g.,* Tr., 2189-90, 3285-86, 3288. These findings included that:

5

- Petitioner had an "Aggravated Role" in the drug conspiracy;

- Petitioner was initially sentenced to 24 years in prison and subsequently was re-sentenced to an increased term of 27 years in prison;

- Petitioner was sentenced additionally to a term of 5 years supervised release, during which he was prohibited from possessing a firearm;

- the severity of Petitioner's sentence was based on "the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct;" and

- Petitioner was "accountable for 2.87 kilograms of methamphetamine actual."

Gov. Trial Ex. 303 at 2-3, 7; Gov. Trial Ex. 304, 2-3, 7.

The Court's sentencing findings were relevant to numerous factual issues at the guilt phase of trial, including whether Petitioner was an organizer, supervisor, or manager of five other persons in a continuing criminal enterprise, whether Petitioner had possessed and/or used a firearm, and whether the drug conspiracy involved more than 100 grams of actual methamphetamine. Further, all of the sentencing findings were directly relevant to the jury's decision whether to sentence Mr. Honken to life imprisonment or to death. For example, the Court's finding of an "Aggravated Role" and its sentencing of Mr. Honken to more than a quarter-century in prison in light of the "seriousness of the offense" directly impacted the jury's appraisal of what

6

additional sentence was appropriate for the instant crimes and indicated the Court's tacit approval of a harsh sentence.

Under Supreme Court law at the time of trial, the Due Process Clause of the Fifth Amendment and the jury trial guarantee of the Sixth Amendment required that the jury assess all facts that constitute an element of a charged crime and/or may increase the punishment for a crime, and that the jury's assessment of those facts required the Government to prove them beyond a reasonable doubt. The Court's "factual findings" that were presented to the jury as incontrovertible facts did not meet those requirements. As such, they were made without the jury considering the facts that went into the Court's prior findings. Moreover, because these findings were made by this Court during the prior sentencing proceeding – at which the burden of proof was only by a preponderance of the evidence – the presentation of this evidence reduced the Government's burden of proving the above described facts beyond a reasonable doubt. This point alone means that Petitioner's death sentence was premised on an unconstitutionally low burden of proof.

Further, when the Government presented and relied upon the Court's factual findings, the Court itself became a witness against Petitioner, in violation of Petitioner's right to compel and confront witnesses against him.

Each of the above-enumerated errors undermined the heightened reliability that

7

due process and the Eighth Amendment require in capital cases.

Despite these well-established legal principles protecting Petitioner from the Government's use of the Court's prior factual findings against Petitioner, trial counsel ineffectively failed to object on these grounds. *See* Tr., 2189. Counsel had no strategic or tactical reason for this failure. Indeed, there was absolutely nothing for the defense to gain and much to lose from the admission of this evidence.

At the guilt phase, trial counsel's failure prejudiced Petitioner by permitting the Government to present improper evidence as to numerous disputed issues, including Petitioner's role in the offense, his possession and/or use of firearms, and the amount of methamphetamine involved in the drug operation. At penalty, trial counsel's failure prejudiced Petitioner in these same ways and by encouraging the jury to reach a harsh verdict, *i.e.*, a death sentence. Indeed, the improper evidence held the imprimatur – and literally the signature – of the same Court that was presiding over the trial, thus exacerbating the prejudice and undermining confidence in the jury's guilt and penalty verdicts.

Appellate counsel's performance also was deficient. The admission of the Court's sentencing findings was plain error and should have been raised as such. At the time of the direct appeal, it was standard practice that appellate counsel in capital cases should litigate all potentially meritorious issues. This standard was enunciated

8

in case law extant at the time of the appeal. There was not, and could not be, any tactical or strategic reason for counsel not to raise this meritorious claim. Appellate counsel's failure to raise the issue prejudiced Petitioner. The error was plain, and would have resulted in the appeals court vacating Petitioner's convictions, or, at a minimum, vacating his death sentences.

## CLAIM TWO

**PETITIONER'S RIGHTS TO EFFECTIVE TRIAL AND APPELLATE COUNSEL, DUE PROCESS, AND AGAINST DOUBLE JEOPARDY AND CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN TRIAL COUNSEL FAILED TO OBJECT TO THE ADMISSION OF EVIDENCE RELATED TO ISSUES PREVIOUSLY LITIGATED AND RESOLVED IN PETITIONER'S FAVOR IN HIS 1998 DRUG CONSPIRACY SENTENCING PROCEEDINGS.**

While counsel failed to object when this Court's prior sentencing findings were introduced and argued to the jury as *faits accomplis* – despite all of the constitutional flaws attendant to the procedure described above in Claim One – counsel failed to seek the same accommodation by litigating and presenting to the jury **helpful** findings made by the Court in the very same sentencing proceedings. This was grossly ineffective.

In Mr. Honken's 1998 sentencing hearing in case CR96-3004-001-MWB, this Court made several findings regarding factual issues that were subsequently disputed and relitigated in the instant case. At the prior sentencing hearing, the Court's factual

9

findings included that:

A.      Petitioner had not continued in a conspiracy to manufacture and distribute methamphetamine while on pretrial release beginning in March 1993, and continuing through and including 1995.  Tr., 2/24/98, 1192;

B.      a Tec-9 handgun had not been present or possessed by Petitioner in the course of the drug conspiracy, where the Government alleged that the handgun had been melted down and destroyed by Petitioner and Timothy Cutkomp in 1993 in order to hide evidence of the crimes Petitioner allegedly had committed with the gun.  *Id*. at, 1245-46, 1220-22, 1240-41;

C.      a gun had not been present or possessed by Petitioner in the course of the drug conspiracy, where the Government alleged that Petitioner had purchased a handgun from Rick Held while Petitioner was on pretrial release in 1996.  *Id*. at 1245-46, 1219-20;

D.      a gun had not been present or possessed by Petitioner in the course of the drug conspiracy where the Government alleged Petitioner had sought a high-powered automatic firearm in order to threaten Mr. Cutkomp if he cooperated with the Government. *Id*. at 1245-46, 1242; and

E.      Petitioner had not attempted to obstruct justice or influence the testimony of witness Dennis Putzier in letters Petitioner sent to Putzier.  *Id*. at 1252-54.

Despite these prior judicial findings against the Government, the Government presented and sought to prove these same facts during the capital trial.  The relitigation of these issues at trial included, but was not limited to:

A(1). the allegations contained in Counts 8 through 12 of the

10

Superseding Indictment that Petitioner "between 1992 and 1998" conspired to manufacture and distribute methamphetamine, the evidence and argument presented by the parties at trial in support and in opposition to these allegations, and the jury's verdicts finding Petitioner guilty of that conspiracy;

A(2).    the allegations contained in Counts 13 through 17 of the Superseding Indictment that Petitioner engaged in a continuing criminal enterprise "between 1992 and 2000" involving a "continuing series of narcotics violations," the evidence and argument presented by the parties at trial in support of and in opposition to these allegations, and the jury's verdicts finding Petitioner guilty of that continuing criminal enterprise;

B.    evidence and argument presented by the Government that Petitioner possessed a Tec-9 handgun in the course of the drug conspiracy, had used the handgun to kill Terry DeGeus, and had melted down and destroyed the handgun with Timothy Cutkomp in order to conceal and destroy evidence of his crimes. *E.g.*, Tr., 24 (Government opening statement); Tr., 739-46 (testimony of Timothy Cutkomp); Tr., 991-94 (testimony of Special Agent Lori Lewis); Tr., 1490-91 (testimony of Fredric Tokars); Tr., 1814 (testimony of Steve Vest); Tr., 2723-24 (testimony of Special Agent William Basler); Tr., 3216, 3239-42 (Government closing argument);

C.    evidence and argument presented by the Government that Petitioner purchased a handgun from Rick Held while Petitioner was on pretrial release in 1996. *E.g.*, Tr., 1063-69 (testimony of Rick Held); Tr., 3246-47 (Government closing argument);

D.    evidence presented by the Government that Petitioner had discussed and sought a high powered automatic firearm in order to eliminate Government witnesses in 1996. *E.g.*, Tr., 20 (Government opening statement); and

E.    evidence presented by the Government that Petitioner had

11

attempted to obstruct justice and influence the testimony of witness Dennis Putzier in letters Petitioner sent to Putzier. Tr., 1322-29.

Petitioner's rights to constitutional collateral estoppel, due process, and double jeopardy barred the relitigation of these issues.

The factual issues alleged, presented, and disputed at trial were indistinguishable from the factual issues that were previously litigated and decided in Petitioner's favor in this Court. The Court's determination of these factual issues was necessary to the outcome of the Petitioner's prior sentencing, as these issues were specifically contested by the parties, were integral to the Court's final sentence of Petitioner, and were set forth in specific findings. The Court made these rulings only after the Government had a full and fair opportunity to litigate the issues. Indeed, in addition to extensive briefing, the Government presented twenty-five witnesses and numerous exhibits in support of its allegations over the course of five days of court hearings between December 15, 1997, and February 24, 1998. The Government even had the opportunity to cross-examine Petitioner over the course of two days. Despite its awareness of potential "collateral consequences" of litigating these issues, the Government, with "thoroughness and zealousness," sought and obtained final factual findings from the Court. Tr., 2/24/98, 1239, 1228. Finally, the prior sentencing proceeding resulted in final judgment against Petitioner.

12

Under these circumstances, Petitioner's rights to due process, constitutional collateral estoppel, and against double jeopardy precluded the Government from relitigating the factual issues that were decided in his favor in the prior criminal proceeding.

Despite well-established law precluding relitigation, however, trial counsel unreasonably failed to raise an objection to the relitigation of these facts. Trial counsel did not have a strategic or tactical reason for this failure. Indeed, Mr. Parrish was present when the Court warned of "collateral consequences in terms of grand jury proceedings and the like," during the sentencing proceeding. Tr., 2/24/98, 1239. Further, trial counsel pursued a double jeopardy objection to the Government's subsequent charges *in toto*. *See United States v. Honken*, 271 F.Supp.2d 1097 (July 21, 2003). But counsel inexplicably failed to raise a collateral estoppel objection based on the Court's prior factual findings in Petitioner's favor, despite the Court's explicit pretrial reference to this omission. *See id.* at 1106 n.2 ("Honken is not asserting the protection of the Double Jeopardy Clause in the sense of 'collateral estoppel,' because he is not relying on any 'ultimate fact' determined *against* the Government in his prior prosecution on the drug conspiracy charge."). Thus, despite being on notice of the issue, and despite the absence of any potential adverse impact of pursuing this set of objections, trial counsel failed to do so.

13

Petitioner was prejudiced by trial counsel's failure. There is a reasonable likelihood that the jury would not have reached guilt verdicts on any of the charged counts, and by definition could not have reached guilt verdicts on Counts 8 to 17, if trial counsel had objected to and excluded the relitigation of these factual issues. Further, even if the jury had reached guilt verdicts on one or more capital charges, there is a reasonable likelihood that the penalty phase verdicts would not have resulted in a death verdict if counsel had objected to this evidence.

Appellate counsel's performance also was deficient. The relitigation of these factual findings was plain error and should have been raised as such. At the time of the direct appeal, it was standard practice that appellate counsel in capital cases should seek to litigate all issues, whether or not previously presented, that were arguably meritorious. Prevailing decisional law recognized that appellate counsel could be ineffective for failing to raise a meritorious claim, even where the claim would have been reviewed under the plain error standard. There was not, and could not be, any tactical or strategic reason for counsel not to raise this meritorious claim. Inasmuch as this is a meritorious claim, appellate counsel's failure to raise it prejudiced Petitioner. The error was plain, and would have resulted in the vacating of Petitioner's convictions and/or vacating of his death sentences.

14

**THE GOVERNMENT VIOLATED DUE PROCESS WHEN IT FAILED TO DISCLOSE EXCULPATORY EVIDENCE RELEVANT TO COOPERATING WITNESSES. TRIAL COUNSEL INEFFECTIVELY FAILED TO DISCOVER THIS EVIDENCE. ACCORDINGLY, PETITIONER'S CONVICTIONS AND SENTENCES VIOLATED THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

The case against Petitioner was built on the testimony of more than a dozen jailhouse informants and other cooperating witnesses. The testimony of these witnesses constituted the only "direct" evidence that Petitioner committed the murders. The Government, however, failed to comport with its obligation to turn over evidence critical to the credibility of these witnesses. The testimony of these witnesses was procured only after the Government threatened, cajoled, induced and coaxed them into providing false, exaggerated, and misleading testimony implicating Petitioner in the charged crimes and in other misconduct. To the extent that trial counsel knew, or reasonably should have known, that the Government procured this testimony in these improper ways, counsel were ineffective. Moreover, counsel were ineffective for failing to investigate fully the backgrounds of these witnesses and for failing to impeach these witnesses with information that was either actually available, or which they could have discovered. Petitioner's right to due process and effective counsel were violated. These errors implicated both his convictions and sentences,

15

as explained herein.

The right to due process requires a prosecutor to disclose favorable evidence that is material to either guilt or sentencing. This requirement is self-executing and does not depend on a specific request for such information from the defense. Government attorneys with actual or constructive knowledge of exculpatory information are required to disclose it, including when such information is known only to law enforcement agents involved in the investigation or prosecution of the matter at hand.

Here, defense counsel requested all such materials. The Government told defense counsel that all exculpatory materials had been turned over and also represented that to the Court. Tr., 8/24/04, 24. However, recent investigation reveals this not to be the case.

The Government presented fifteen jailhouse informants and/or cooperating witnesses to the jury: Dan Cobeen, Timothy Cutkomp, Dean Donaldson, William Dean, Dennis Putzier, Terry Bregar, Daniel Frye, Frederick Tokars, Ronald McIntosh, Steve Vest, Steven Ferguson, Anthony Altimus, Anthony Johnson, Joseph McGee, and Michael Kluver. The Government used coercive tactics with many of these witnesses and failed to disclose that to the defense. In addition, many of these witnesses testified with the expectation of receiving benefits in return. These

16

expectations were based on either express promises made by law enforcement or implied "wink and nod" inducements. Information relevant to some of these inducements were not provided to the defense. The Government also failed to disclose impeachment evidence relevant to the veracity of these witnesses and evidence of bias and motive to lie, including information that some of these witnesses had been cooperating with law enforcement agencies for years. Additionally, many of these witnesses were transported to the trial together or were otherwise in the presence of one another and discussed their testimony and their expectations of favorable treatment among themselves. This, too, was not revealed to the defense.

## A. Evidence that Was not Disclosed.

The Government used questionable tactics at times to entice jailhouse informants to cooperate, but failed to disclose this information to the defense in compliance with due process. This Court had an inkling that such inappropriate tactics were being undertaken by the Government at the time of Petitioner's previous sentencing by this Court. Indeed, during that sentencing proceeding, the Court commented that "something happened between the proffer and the testimony" of Timothy Cutkomp which resulted in Cutkomp testifying to larger quantities of methamphetamine being produced than he had indicated at his initial proffer. Tr., 2/24/98, 1179. The Court was certainly on to something. Undersigned counsel have

17

developed evidence that the Government in fact engaged in questionable tactics and failed to turn over exculpatory material to trial counsel.

Informants have indicated that they were pressured by the Government to provide testimony against Petitioner. Terry Bregar has indicated that Government officials, who interviewed him at the prison, pressured him to say that Petitioner had confessed to committing the murders. Mr. Bregar repeatedly told the agents of the Government that Petitioner had never said such things in his presence, yet they persisted in their efforts to get him to say so. Ultimately, in spite of this pressure, Bregar refused to testify that Petitioner had confessed to him, but did testify about an escape plan allegedly involving Petitioner.

Dennis Putzier, who also was called by the Government at Petitioner's trial, was threatened with a life sentence if he did not testify in the manner that the Government wished. After testifying at Petitioner's drug sentencing, but before testifying at Petitioner's capital trial, he was visited in prison by Government agents. He was told that if he did not testify that Petitioner confessed to committing the murders to him and that Petitioner was involved in an escape plan with him, he would be charged with conspiracy to commit murder. He was shown the sentencing guideline chart and was told he would be facing three hundred and sixty months to life in prison. He has stated that the only reason he testified as he did was because

18

of these threats.

Thus, at a hearing, Petitioner will present evidence that the Government engaged in coercive tactics to get jailhouse informant witnesses to cooperate and to testify. The fact that the defense was not made aware of these tactics and of any pressure exerted toward witnesses violated Petitioner's right to due process.

The Government suppressed additional exculpatory material. Terry Bregar testified that Petitioner was involved in an escape plan and that Petitioner had told him that he had bailed Dean Donaldson out of prison to take care of some things for him. He also testified that Petitioner had made a motion as if shooting a gun when he told Bregar that witnesses had not shown up in his earlier case. The Government elicited testimony from Bregar that his sentence was reduced by four and a half years in return for his cooperation. Tr., 1385. However, what was not revealed was that Mr. Bregar had a massive stroke prior to his testimony at Petitioner's trial. The stroke left him blind and, affected his memory. He has told undersigned counsel that the Government knew he had a stroke and that it had a significant impact on his memory. Yet, the Government failed to disclose this to the defense. Indeed, the Government asked him in leading fashion if his blindness was caused by diabetes. Tr., 1383-84. In fact, his blindness was caused by the stroke, which also affected his memory. The Government knew this fact but failed to reveal it to the defense. This violated due

19

process.

Dennis Putzier testified that Petitioner had confessed to him and that Petitioner tried to escape from the Woodbury jail at a time when they were both inmates there. As stated above, Mr. Putzier has recently disclosed that he was pressured by the Government to provide this testimony. Indeed, he was threatened with a life sentence if he did not. Additionally, he has stated that he never spoke to Petitioner face-to-face in the prison. There was always a window or door between them. He has also stated that there is no way that Petitioner could have made it to Putzier's block for the alleged escape attempt, and that Putzier told that to the agents. He testified that Petitioner tried to escape with him only because he was afraid of a life sentence. This evidence was not revealed to Petitioner in violation of due process.

Both Mr. Putzier and Mr. Bregar have confirmed that many of the jailhouse informant witnesses were transported to Sioux City together and were otherwise held together at various times prior to testifying either at Petitioner's earlier sentencing proceeding, at a grand jury inquiry, or at Petitioner's capital trial. At those times, groups of informant witnesses would discuss the case and their testimony with each other, compare notes and make up stories based on these group conversations. Additionally, they all talked about hoping to reductions in their sentences and about other benefits that they expected in return for their testimony. However, much of this

20

information was never turned over to the defense or was denied by the witnesses during their testimony.

Additionally, many of these cooperating witnesses had been cooperating with the authorities in other matters and had been doing so prior to the time they claimed that Petitioner made incriminating statements to them. The introduction of such statements, made at a time when Petitioner was in custody and when he was being questioned by an agent of the Government, violated Petitioner's rights to remain silent (Fifth Amendment) and right to counsel (Sixth Amendment). Additionally, the fact that informant witnesses had cooperated in the past is evidence of bias and motive that should have been turned over to the defense. Failure to do so violated due process.

### B. Counsel's Deficient Performance

To the extent that trial counsel could have uncovered additional evidence that was not provided by the Government regarding these jailhouse informants and cooperating witnesses, counsel's performance was deficient. Had counsel conducted a thorough investigation into these witnesses, counsel could have learned that the Government procured the testimony of these witnesses in the improper ways described above, and that some of these witnesses had long histories of cooperating with the Government. Counsel also could have learned about the group meetings

21

held among many of these cooperating witnesses and their expectations of favorable treatment. To the extent that counsel could have uncovered this evidence in the face of the Government's suppression of it, counsel's performance was deficient.

Additionally, counsel were ineffective for failing to present evidence that would have further challenged the veracity of the jailhouse informants. Counsel presented only two witnesses in this regard – David Loparo and Neal Huffman – although many more were available. These two witnesses each testified that they knew Petitioner in prison and that he never admitted to them that he killed anyone. Tr., 2960 (Loparo); Tr., 3073 (Huffman). Loparo refuted McGee's assertion that Petitioner confessed to him in the presence of Loparo (Tr., 2967), and testified that Fred Tokars repeatedly asked him for information about Petitioner (Tr., 2964-65). Huffman testified that some of Petitioner's legal materials disappeared in the prison (Tr., 3047; 3059), and that jailhouse informant Steve Vest had access to Petitioner's legal materials (Tr., 3049) and went out of his way to become Petitioner's cellmate (Tr., 3052). Thus, counsel only presented evidence to challenge three of the more than a dozen jailhouse informants and other cooperating witnesses, although evidence was available to rebut them all. For example, there were numerous witnesses who would have testified that cooperating witnesses had admitted to them that they fabricated evidence against Petitioner to assist themselves in their own

22

cases. Witnesses could have testified that jailhouse informants admitted to them that they had read Petitioner's legal documents and were fabricating evidence based on that. Other witnesses could have testified that the Government attempted to coerce them into lying about Petitioner, but they refused. Some of these witnesses were known to Petitioner's lawyers, yet they failed to present this evidence to the jury. Counsel's performance was deficient.

### C. Materiality and Prejudice.

The suppression by the prosecution of exculpatory evidence violates due process when that evidence is material. Materiality is determined not on the basis of whether a defendant would more likely than not have received a different verdict, but on whether, in the absence of the suppressed evidence, he received a fair trial. Thus, materiality is established if there is a reasonable probability of a different result.

Here, the suppression of the exculpatory information going to the credibility of these informants and cooperating witnesses is highly material. Without this testimony, the case against Petitioner was largely circumstantial. There was no eyewitness testimony. There was no confession to actual law enforcement. Indeed, there is no forensic evidence whatsoever to connect Petitioner to the crimes. The only direct evidence that Petitioner committed these crimes came from the alleged confessions Petitioner gave to the jailhouse informants. Had the Government turned

23

over the suppressed evidence, the testimony of these cooperating witnesses would have been decimated.  The wholesale challenge to the credibility of these witnesses that could have been mounted would certainly have resulted in the probability of a different verdict and/or sentence.  Moreover, if even some of the undisclosed inducements had been disclosed, or surfaced by effective counsel, the jury would have had a better view of the improper tactics being employed by the Government.  Such a view would have caused the jury to view the entire investigation and Government presentation with a more discerning eye.  For the same reasons, this evidence caused Petitioner prejudice.  In either event, confidence in the outcome of the trial and sentencing is undermined, and Petitioner should be granted a new trial.

D.  **On-going Investigation and Need for Court Assistance to Complete Investigation.**

Undersigned counsel have located and interviewed a number of the above-described witnesses. As to others, counsel simply ran out of time given the shortened time available to devote to this investigation.  And, as to others still, Court intervention will be required to permit interviews because a number of the witnesses are in undisclosed locations as part of a witness protection program.

Petitioner believes that he has presented a *prima facie* case that the Government engaged in improper tactics in these regards.  This *prima facie*

24

presentation should be sufficient to permit discovery related to this issue and a hearing. Petitioner believes that he has located and identified the tip of the iceberg, and will seek the Court's assistance in further surfacing this misconduct.

**CLAIM FOUR**

**PETITIONER'S CONVICTIONS AND SENTENCES RESULTING FROM HIS CONVICTIONS FOR VIOLATION OF 21 U.S.C. § 848(C) (CONTINUING CRIMINAL ENTERPRISE) WERE OBTAINED IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

Counts 13 to 17 of the Superseding Indictment alleged that Petitioner was an organizer, supervisor, or manager of five other persons in a continuing criminal enterprise, in violation of 21 U.S.C. § 848(c). The five other persons over whom Petitioner was alleged to have acted as an organizer, supervisor, or manager were Timothy Cutkomp, Gregory Nicholson, Terry DeGeus, Angela Johnson, and Jeffrey Honken. *See* Superseding Indictment at 17-35; Dkt. # 512 at 26-27, 77-78 (jury instructions).

In reality, Jeffrey Honken occupied a higher position than Petitioner in the hierarchy of the alleged drug operation, and Petitioner did not act as an organizer, supervisor, or manager of Jeffrey Honken. Evidence was available to trial counsel that would have refuted the Government's contrary allegations, but trial counsel unreasonably failed to discover and/or present this evidence. The evidence available

25

to trial counsel included numerous witnesses and documentary evidence demonstrating that:

- Jeffrey Honken held considerable sway and influence over his younger brother, Dustin Honken, including in the formulation and operation of the alleged drug operation;

- Jeffrey Honken acted as the organizer, supervisor, and manager of Petitioner – not vice versa – in the instant drug operation and in earlier schemes and drug operations that gave rise to the instant one;

- Jeffrey Honken minimized and misstated his role in the drug operation, including regarding his financial profits and his decision-making role;

- Jeffrey Honken was the older and dominant brother and did not take orders or direction from Petitioner about anything; and

- Jeffrey Honken was never organized, supervised, or managed by Petitioner in the drug operation.

Further, in instructing the jury regarding the elements of a continuing criminal enterprise, the Court instructed that, "You are *not* required to agree unanimously as to the identities of the five persons." Dkt. No. 512 at 26 (emphasis in original). This was clearly erroneous, as the Government alleged the statutory minimum number of persons (one organizer plus five others acting in concert) to constitute a continuing criminal enterprise under 21 U.S.C. § 848(c). As such, the jurors were required to unanimously agree that the Government had proven its allegation that Petitioner

26

organized, supervised, or managed Jeffrey Honken, Timothy Cutkomp, Greg Nicholson, Terry DeGeus, and Angela Johnson. The Court failed to so instruct the jury. The Court's instructions misstated the law and misled the jury on an indispensable element of Counts 13 through 17. Trial counsel, however, failed to object to the Court's instruction.

Trial counsel's failures constituted deficient performance. Trial counsel did not have a strategic or tactical reason for failing to develop and present evidence that Jeffrey Honken was not organized, supervised, or managed by Petitioner. Indeed, trial counsel presented two witnesses at guilt phase – Marvea Honken and Alyssa Honken – for this purpose and argued the issue in closing. Tr., 3376-77. Thus, counsel were alerted to the importance of the issue and had no sound tactical or strategic reason either for failing to collect and present evidence from additional sources, including from one of the alleged controlees (Jeffrey Honken) – which would have obviously carried great weight with the jury – or to object to the Court's erroneous instruction.

Petitioner was prejudiced by trial counsel's failures. Had counsel performed effectively in these regards, there is a reasonable likelihood that the jury would not have reached guilt verdicts on Counts 13 to 17, and that the jury would not have sentenced Petitioner to death on any counts.

27

Additionally, the Government violated Petitioner's due process rights by failing to disclose material evidence that Petitioner did not organize, supervise, or manage Jeffrey Honken in the drug operation. Petitioner will seek the evidence that they believe is and was in the Government's possession in a to-be-filed discovery motion.

## CLAIM FIVE

**PETITIONER'S RIGHTS TO EFFECTIVE ASSISTANCE OF COUNSEL, DUE PROCESS, AND AGAINST DOUBLE JEOPARDY AND CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHEN TRIAL COUNSEL FAILED TO OBJECT TO MULTIPLICITOUS CHARGES FOR DRUG CONSPIRACY MURDER AND CONTINUING CRIMINAL CONSPIRACY MURDER, IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The drug conspiracy charges set forth in Counts 8 through 12 of the Superseding Indictment were lesser included offenses, and multiplicitous, of the continuing criminal enterprise charges set forth in Counts 13 through 17, respectively. Despite the existence of controlling case law at the time of trial, counsel failed to move to dismiss the duplicitous counts.

Trial counsel provided deficient performance by failing to object to the multiplicitous counts. Trial counsel had no strategic or tactical reason for failing to object. Indeed, trial counsel raised a double jeopardy objection against successive prosecutions, *see United States v. Honken*, 271 F. Supp. 2d 1097 (N.D. Iowa, 2003), but failed to raise the meritorious double jeopardy objection based on multiplicity.

28

Counsel for Petitioner's co-defendant, by contrast, successfully litigated such an objection in the same case in the same Court. *See United States v. Johnson*, 495 F.3d 951, 981 (8th Cir. 2007).

Trial counsel's failure prejudiced Petitioner. Had trial counsel objected, Petitioner would have been granted relief, at a minimum, from his convictions on drug conspiracy murder charges in Counts 8 to 12. *See United States v. Honken*, 541 F.3d 1146, 1153-54 (8th Cir. 2008) (recognizing that relief would have been warranted if trial counsel had not waived the claim).

In addition, if trial counsel had protected Petitioner's double jeopardy rights against being convicted on multiplicitous counts, there is a reasonable likelihood that Petitioner would not have been sentenced to death on any counts. At the penalty phase, the jury was directed to twice consider the prospect of a death sentence for each murder, and, in effect, to double-count as aggravating factors the multiplicitous counts. This scenario twice put Petitioner in jeopardy of life, in violation of the Double Jeopardy Clause. It also violated Petitioner's rights to due process and against cruel and unusual punishment by unduly emphasizing the option of a death sentence to the jury. Also, by permitting the jury to double count, the death sentence was arbitrary and capricious in violation of the Eighth Amendment. If trial counsel had objected to the multiplicitous counts, there is a reasonable probability that the

29

jury would not have sentenced Petitioner to death on any counts, or that the Court of Appeals would have vacated any death sentence.

CLAIM SIX

**PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS WERE VIOLATED WHEN TRIAL COUNSEL INEFFECTIVELY FAILED TO OBJECT TO THE ADMISSION OF HEARSAY EVIDENCE REGARDING THE QUANTITY OF DRUGS ALLEGED IN THE SUPERSEDING INDICTMENT; APPELLATE COUNSEL INEFFECTIVELY FAILED TO RAISE AND LITIGATE THIS ISSUE.**

One of the essential elements of the drug conspiracy murder charges, Counts 8 through 12, was "that the conspiracy involved at least 100 grams of pure meth." Tr., 3285 (Government's closing argument); *see* Superseding Indictment at 14-17 (alleging, under 21 U.S.C. §§ 846 and 841(b)(1)(A), a conspiracy to manufacture and distribute "100 grams or more of pure methamphetamine and 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine"); Tr., 3416 (jury instructions). The 100-gram threshold was likewise an integral part of the continuing criminal enterprise charges, Counts 13 to 17. *See* Dkt. # 512 at 29-30, 75-76 (jury instructions); Superseding Indictment at 17-35.

The primary evidence the Government presented to meet its burden of proving that the conspiracy involved more than 100 grams of pure methamphetamine was the laboratory report of Criminalist Debra Davis, as presented through the hearsay

30

testimony of police officer Frank Stearns. *See* Tr., 48-50. At closing argument, the only evidence the Government relied on to argue that it had met its burden of proving this element was, again, Davis's laboratory report. Tr., 3285-86.[1]

Despite the Government's reliance on Ms. Davis's report to establish this element of the crimes, however, Ms. Davis did not testify and Petitioner thus had no opportunity to confront her conclusions – or the evidence collection, testing, and analysis upon which her conclusions were based. The straightforward application of Supreme Court law in effect at the time of trial precluded the use of such testimonial hearsay without an opportunity for cross-examination.

Trial counsel were ineffective for failing to assert Petitioner's confrontation rights to preclude the hearsay presentation of Mr. Davis's report. Counsel had no strategic or tactical reason for this failure. Indeed, Ms. Davis's conclusions were an essential part of the Government's case against Petitioner, and every opportunity should have been made to challenge those conclusions. In Petitioner's 1998 sentencing, trial counsel Parrish succeeded in obtaining a finding that a similar drug quantity report was "false, fraudulent, whatever word you want to use, and

---

[1] Although the Government did not expressly rely on this Court's drug quantity findings as set forth in Judgment and Amended Judgment in Petitioner's prior drug case, those findings were before the jury in Government exhibits 303 and 304. To the extent the jury relied on those findings in determining the drug amounts involved in the conspiracy, that reliance was improper as set forth in Claim One.

31

misleading." Tr., 2/24/98, 1174. Significantly, the law enforcement agencies who collected the evidence for Ms. Davis's report also participated in the collection of the evidence in the false, fraudulent, and misleading report. Cross-examination of Ms. Davis would have been a fertile ground for challenging her assumptions, credentials, methods, and conclusions. Trial counsel's failure to protect Petitioner's confrontation rights was unreasonable and deficient.

Petitioner was prejudiced by trial counsel's failure. The jury would not have reached guilt verdicts on Counts 8 to 17 if trial counsel had objected to and excluded the hearsay presentation of Ms. Davis's report. In the absence of guilt verdicts on those counts, Petitioner could not have been sentenced to death.

Appellate counsel's performance was also deficient. The admission of Ms. Davis' report through hearsay was plain error and should have been raised as such. At the time of the direct appeal, it was standard practice, and case law required, that appellate counsel in capital cases were expected to litigate all arguably meritorious issues, even when the claim would be reviewed under the plain error standard. There was not, and could not be, any tactical or strategic reason for counsel not to raise this meritorious claim.

Appellate counsel's failure to raise the issue prejudiced Petitioner. The confrontation error was plain, and would have resulted in the appeals court vacating

32

Petitioner's convictions on Counts 8 to 17, and thus vacating his death sentences as well.

**CLAIM SEVEN**

**PETITIONER'S RIGHTS TO DUE PROCESS, TO AN IMPARTIAL JURY, TO EFFECTIVE ASSISTANCE OF COUNSEL, AND AGAINST CRUEL AND UNUSUAL PUNISHMENT WERE VIOLATED WHERE TRIAL COUNSEL FAILED TO OBJECT TO THE EXCLUSION OF QUALIFIED JURORS FROM THE VENIRE, CONTRARY TO *WITHERSPOON V. ILLINOIS* AND ITS PROGENY; APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE AND LITIGATE THIS ISSUE; ALL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

During jury selection, trial counsel unreasonably consented to the removal of at least 29 venire members for cause without any voir dire inquiry regarding their ability to be impartial and to follow the law. Counsel's agreement to these removals constituted ineffective assistance of counsel in light of *Witherspoon v. Illinois*, 391 U.S. 510 (1968), and its progeny. Further, the Court's failure to supervise these removals abdicated its Article III responsibility to supervise the voir dire in a criminal trial. Trial counsel's acquiescence to this method of jury selection and the way in which it actually transpired constituted ineffective assistance of counsel.

One thousand potential jurors were each mailed a thirty-page questionnaire in advance of Petitioner's trial. After eliminating persons who could not be located or who did not return their questionnaires, counsel for both parties entered an agreement

33

to exclude nearly 250 potential venirepersons for cause, based solely on answers given in the questionnaires. *See* Dkt. # 342, Order (July 29, 2004). Approximately 163 of the 250 were excused based on their answers to Question 72 of the questionnaire, regarding *Witherspoon* eligibility. Question 72 reads as follows:

72. Regarding the death penalty, which of the following ten statements most accurately represents your beliefs? Please read all ten statements, take some time to reflect, and then circle the appropriate statement(s):

  a. I am personally, morally, religiously or otherwise opposed to the death penalty, and will never vote to impose it under any circumstances.

  b. I am strongly opposed to the death penalty, and I will have a difficult time voting to impose it.

  c. I am philosophically, morally, or religiously opposed to the death penalty. Nonetheless, I believe that I can vote to impose the death penalty if it is called for by the facts and the law in the case.

  d. I am generally opposed to the death penalty. Nonetheless, I believe that I can vote to impose the death penalty if it is called for by the facts and the law in the case.

  e. In a case in which the defendant is convicted and in which the death penalty is requested, I can vote to impose the death penalty, or a sentence other than death, which ever [sic] is appropriate based on the facts and the law in the case.

  f. I am generally in favor of the death penalty.

34

Nonetheless, I believe that I can vote to impose a sentence other than death if it is called for by the facts and the law in the case.

g.      I am philosophically, morally, or religiously in favor of the death penalty. Nonetheless I believe that I can vote to impose a sentence other than death if it is called for by the facts and the law in the case.

h.      I am strongly in favor of the death penalty, and I will have a difficult time voting against it.

i.      In a case in which the defendant is convicted and in which the death penalty is requested, I will always vote to impose the death penalty.

j.      None of the above.

Thus, the Questionnaire obviously was designed to ferret out those jurors who would be excludable under *Witherspoon* (those who answered "yes" to "a"), and those who would be excludable under *Morgan v. Illinois*, 504 U.S. 719 (1992) (those who answered "yes" to "i").

In actual live voir dire, those who provided answers on the next grade in from either end of the spectrum, *i.e.*, those who answered "yes" to either question "b" or "h" would be subject to further probing as to whether those answers would substantially impair their ability to follow the Court's instructions. Depending on follow up questioning, some of those jurors may have been deemed qualified, while with respect to others it may have been shown that they were appropriate to strike for

35

cause.

Upon the completion of the questionnaires in this case, 29 potential jurors were struck for answering "b." Rather than subjecting these jurors to further probing, counsel engaged in a trade that should have ostensibly resulted in the elimination of all potential jurors from either end of the spectrum (initially eliminating those who answered yes to "a" and "i" and then eliminating those who answered "yes" to "b" and "h"). However, a review of the questionnaires tells a different story.

In reality, a number of venire persons who answered "yes" to "h" (those who would have a difficult time *not* imposing it) were left in the "qualified pool." Trial counsel failed to secure the removal of venire persons 24, 556 and 574, each of whom had answered "h" or "i" to Question 72. Moreover, some of the struck "b" venire persons were struck even though they answered follow-up questions indicating that they could be impartial and follow the Court's instructions. At least 8 venire persons who answered "b" nonetheless indicated in response to subsequent questions that they could be impartial and impose the death penalty in accordance with the law. (*See* Questionnaires for venire persons 338, 635, 668, 701, 809, 916, 935 and 945). For example, venire person 945 stated that "I am unsure how I feel about the death penalty [] I believe that it is religiously wrong, but I am not 100% against it," indicating her ability to follow the law as instructed. Nothing in the questionnaires

36

indicates that these venire persons were properly excludable under *Witherspoon*.

Trial counsel rendered ineffective assistance by entering into an agreement in which these and other qualified jurors were removed. Jurors who were not *Witherspoon*-excludable were lost, while comparable pro-death candidates remained in the qualified pool. There was not an "even trade" between the parties.

Trial counsel had no strategic reason for entering the agreement as submitted to the Court. Venire person 556, for example, answered "i" to Question 72, indicating she would always vote for death upon conviction, but trial counsel did not include her in the trade and *later* challenged her for cause during voir dire on those same grounds. Tr., 3170.

Trial counsel's ineffective handling of this critical task was traceable to their delegation of the review and analysis of the questionnaires to a consultant with limited or no experience in capital cases. Multiple jurors were identified incorrectly in the jury consultant memorandum, and therefore struck improperly. For example, Juror 12 was struck for cause for answering "b", despite the fact that on her questionnaire she answered "d." Juror 809 circled answers "b", "c" and "e", yet also was struck for answering "b", despite the agreement between parties that jurors who circled multiple answers would remain in the larger pool and be subject to in-person voir dire. Tr., 3170. Nearly a dozen errors of this nature were uncovered when an

37

incomplete sample of the questionnaires was reviewed by current counsel.

Further, the Court abdicated its Article III responsibility to preside over and supervise this important process. The Court did not review or evaluate the grounds for excluding these jurors at all. Tr., 3170. This exacerbated the *Witherspoon* error, as that precedent requires judicial supervision and exercise of discretion in deciding whether extreme jurors (those expressing sentiments approximated by answers a, b, h and i) can be rehabilitated. Trial counsel's failure to object to this procedure and acquiescence to aspects of it was ineffective.

Petitioner was prejudiced by counsel's ineffectiveness. Any violation of *Witherspoon* is prejudicial; the wrongful exclusion of even a single venire person for cause is grounds for vacating the death penalty.

Similarly, appellate counsel rendered ineffective assistance by not raising and litigating *Witherspoon* claims for each of the improperly excluded jurors. At the time of the direct appeal, it was standard practice that appellate counsel in capital cases should seek to litigate all issues, whether or not previously presented, that are arguably meritorious. As relief from the death penalty would result from a single successful challenge, there was not, and could not be, any tactical or strategic reason for counsel not to raise this meritorious claim. As success on any single *Witherspoon* claim would have resulted in the vacating of Petitioner's death sentence, and there

38

were at least 29 opportunities to prove constitutional error in this case, there is a reasonable probability that, but for appellate counsel's ineffectiveness, the outcome of that proceeding would have been different.

For the same reasons, appellate counsel also was ineffective in not pursuing the meritorious *Witherspoon* claims raised by trial counsel regarding the court's exclusion, after voir dire, of jurors 538 and 813. Both jurors maintained their ability to be impartial; these claims were supported by the record; and there was no tactical or strategic reason to waive them. Petitioner was prejudiced by counsel's ineffectiveness in this regard as well.

### CLAIM EIGHT

**THE SYSTEMIC EXCLUSION AND/OR UNDER-REPRESENTATION FROM THE JURY POOL OF AFRICAN AMERICANS, LATINOS AND OTHER MINORITY GROUPS VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS. COUNSEL INEFFECTIVELY FAILED TO LITIGATE CHALLENGES TO THIS UNCONSTITUTIONAL SYSTEM FOR SUMMONING VENIRE PERSONS.**

Petitioner was denied a jury pool representing a fair cross-section of the community in violation of the Fifth, Sixth and Eighth Amendments. The initial jury pool for Petitioner's capital trial included over 600 people. Only one panelist was African American, while just two were Latino – numbers dramatically unrepresentative of the Northern District of Iowa. Other groups were also under-

39

represented.  No African American or Latino prospective jurors were represented in the smaller "qualified pool" of 75 venire persons from which the panel of 18 jurors ultimately derived.

The right of a defendant to a jury chosen from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial.  Petitioner herein alleges a *prima facie* "fair cross-section violation" under the Sixth Amendment: (1) the relevant community contains a distinctive group; (2) the representation of the distinctive group in the venire or jury pool is not fair and reasonable in relation to the population of the group in the community; and (3) this under-representation resulted from systematic exclusion of the group from the jury selection process.

African Americans and Latinos are both distinctive groups within the Northern District of Iowa.  The representation of both groups was neither fair nor reasonable in relation to the populations of these groups in the community.  As of 2000, the census closest to Petitioner's trial, African Americans made up 1.65% of the population in the Northern District, yet were only 0.17% of the larger venire pool, and 0.00% of the qualified pool.  Likewise, Latinos were 2.39% of the Northern District's population, yet were represented as only 0.33% of the venire pool, and 0.00% of the qualified pool.

40

Two methods of analysis are typically used to determine the reasonableness of racial disparities in fair-cross-section claims: comparative disparity and absolute disparity. Comparative disparity is calculated by dividing the absolute disparity by the population percentage of the group in the community and then multiplying by 100. Thus, this method looks at the percentage decrease in the probability that members of the distinctive group at issue will be selected for the jury wheel because of systemic under-representation. For African Americans the comparative disparity in Petitioner's case was 90% for the larger venire and 100% for the qualified pool. For Latinos, the comparative disparity was 86% for the larger venire and 100% for the qualified pool. Comparative disparity is often used when the base populations involved in the claim are small relative to the total population concerned.

Absolute disparity is calculated by subtracting the percentage of a distinctive group on the jury wheel from the percentage of that group in the community. In Petitioner's case, there was an absolute disparity of 1.48% for African Americans and 2.06% for Latinos.[2] These are dramatic and unreasonable differences and denied Petitioner his right to a jury comprising a fair cross-section of the community.

---

[2] The maximum absolute disparity for any distinctive group cannot exceed the percentage it holds within the total population. In Petitioner's case the *maximum* absolute disparity for African Americans was 1.65%, while for Latinos it would have been 2.39%.

41

Such significant statistical disparities alone, particularly in a venire pool of over 600 people, are sufficient to establish that the under-representation is the result of systematic exclusion – that is, under-representation is inherent in the system being employed. Nonetheless, Petitioner specifically alleges that the Northern District of Iowa's jury selection method resulted in a systematic exclusion of African Americans and Latinos from the rolls. This method resulted in an unreasonable and unfair representation of African Americans and Latinos in Petitioner's jury pool, denying Petitioner a fair trial.

Trial counsel were ineffective for failing to raise this issue at the time of jury selection. All the information relied upon by post-conviction counsel were available at the time of trial. Furthermore, the Court granted counsel's motion for funding (Dkt. # 538) and use of jury selection "experts" who ultimately provided counsel with lists of potential jurors sorted by a variety of demographic information. However, the sorted summaries provided to counsel included absolutely no race information, either because counsel failed to request it, or unreasonably relied upon an analyst's determination of what juror characteristics were germane to capital trial jury selection. There was no strategic reason for counsel's failure to object to the lack of a fair cross-section in the jury pool; counsel were simply unaware of the facts.

Similarly, appellate counsel were ineffective for failing to raise this issue. At

42

the time of the direct appeal, it was standard practice that appellate counsel in capital cases should seek to litigate all potentially meritorious claims. There was not, and could not be, any tactical or strategic reason for counsel not to raise this meritorious claim. Appellate counsel's failure to raise the issue prejudiced Petitioner. The error was of a constitutional magnitude, and would have resulted in the appeals court vacating Petitioner's death sentences.

## CLAIM NINE

### PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT HIS CAPITAL SENTENCING.

*"I would shoot you in the head before I would let the authorities have their way with you"*

*"If the authorities came around I'd shoot it out with them"*

*"I will kill all the people who ratted on me and will need a backhoe big enough to bury everybody"*

Words spoken by Petitioner's father (Jim Honken) to Petitioner at a young age.

### A. Introduction.

Petitioner's childhood was marked by severe family dysfunction. His father was an arsonist, insurance cheat, thief, counterfeiter, bank robber, violent criminal and chronic perpetrator of fraud. He was suicidal and a severe, debilitated and non-functioning alcoholic. He was abusive to Dustin Honken and all of those around him.

43

Mr. Honken's mother suffered from depression for most of her adult life. Accordingly, she was unable to provide the stability and nurturing required for a young man to grow into a productive, mentally healthy and law abiding adult. She withdrew from performing her most basic maternal duties – first by being absent from the home while she had affairs when still married to Petitioner's father, and second by withdrawing into a relationship with her new husband. She failed to protect her young son from Jim Honken's enlistment of him in his criminal enterprises. She turned a blind eye, even though she knew what was going on.

Counsel were aware of most of the above summarized facts. They even presented some of them in the penalty hearing. However, counsel were woefully unaware of the mental health implications of these facts. Current counsel have marshaled the mental health significance of these facts. Petitioner's history, which is really indisputable, has significant mental health implications. While they do not excuse his adult criminal conduct, they offer the type of explanation for his actions that the Eighth Amendment requires be presented to the fact finder. These explanations were available, but were not presented.

Yet, there was even more mitigating evidence available to counsel but that was not presented. In addition to manufacturing methamphetamine, Petitioner sampled his product in large doses and with great consistency. While he was cooking meth,

44

he used it daily – for months on end – and he also used other illegal drugs, including LSD, marijuana, pure grain alcohol, and cocaine. After he left Arizona and returned to Iowa, his drug abuse continued.

Singularly, or in combination, Petitioner's drug use caused severe impacts on this thinking and judgment. His ability to reason, to trust, to make proper judgments, and to control his impulses and emotions, became severely impaired. This started when he was in Arizona making drugs and continued up to and including the date of the capital offenses. Trial counsel failed to investigate Petitioner's drug use. Counsel failed to employ any expert to explain the impact on Petitioner's functioning caused by his drug use.

Significant and unpresented mitigating evidence was extant in this case. It went either uninvestigated or undeveloped and it was never presented to the jury. Counsel violated their fundamental duties imposed by the Sixth and Eighth Amendments.

### B. Family Abuse and Dysfunction.

The story of Dustin Honken started years before his birth. His mother, Marvea Hamilton, met and married the older Jim Honken when she was a teenager. Both came from families in which mental illness was rampant, and where dysfunction was the norm. Marvea married as a way to escape her own family, which was wracked

by alcoholism and mental illness. She gave birth to Petitioner's older brother, Jeff Honken, in 1962. After a series of miscarriages, she gave birth to Matthew Honken, who died at the age of two days. She never saw or held her infant; Jim had him buried before she came home from the hospital. Jim removed all signs of the child that they expected to come home from the hospital. It was as if Marvea was never pregnant. This event caused Marvea to become melancholy – a mood that eventually turned into chronic depression.

Meanwhile, Jim began his life of crime and deceit. He destroyed a construction crane for insurance money. He stole boat motors. He burned down his own property, on several occasions, to collect insurance money. He shot and killed and otherwise abused family pets in front of young Dustin. Not only did Jim Honken engage in ongoing and persistent criminal activity – which would have been bad enough – he also openly bragged about it to his young children.

During the time that Dustin lived with his natural mother and father, his father's drinking increased. It got to a point where Jim Honken would drink during all of his waking hours. Unquestionably, this drinking had a profound impact on the mental health of everyone in the family. Marvea became depressed, eventually carrying on an affair with a man whom she later married. In the depths of her own depression, she was unable to offset the impact of Jim's behavior on the children.

46

Over time and even after Jim and Marvea divorced, Jim recruited young Dustin into his criminal world. He had young Dustin Honken assist in a variety of his criminal enterprises. Jim went beyond bragging – he menaced his young son. He talked about witness elimination as a means of escaping responsibility for his actions. He threatened to kill his young son if the authorities ever closed in on him. He threatened to attack police officers if they closed in on him. Dustin Honken suffered physical and emotional trauma that manifested itself in a variety of settings and contexts.

Counsel failed to investigate and present evidence of the history of mental illness, alcoholism and family dysfunction present on both sides of the Honken family. In a significant lapse, counsel failed to investigate that Marvea Honken was diagnosed with depression and had been treated for it for years before trial. Her mother, her sister, her daughter, and a nephew also have histories of mental illness. Petitioner's maternal uncle also has struggled for years with severe depression and alcoholism. He has been on medication for depression for many years. His children have also had numerous mental health problems. His daughter has struggled with depression and alcohol issues for years. His son has had similar problems.

Some of this history – although not all – was presented at trial. However, what the jury and the Court lacked was an explanation for why this history mitigates. The

47

facts that are summarized here can have profound implications on the development of a child. In Petitioner's case, they did. These implications are explained below.

## C. Drug Use.

In an initial rebellion against his father's alcoholism, young Dustin foreswore drugs and alcohol. This changed dramatically when he began participation in the manufacture of methamphetamine in Arizona. What started out as sampling of the product became multi-daily use for prolonged periods. Significantly, the methamphetamine that Petitioner was making was of unusual potency – up to 97% pure. He also consumed other drugs in the months leading up to the capital crimes, including LSD, cocaine, marijuana and grain alcohol.

Counsel utterly failed to inquire and investigate these facts. They relied on the fact that by the time Dustin was being tried for the capital case, he looked "fine." However, counsel did not consult with an expert who could have advised them that while severe, the effects of even heavy meth use abates in time. Counsel failed to interview witnesses who knew of Dustin's drug use during his time in Arizona and thereafter.

## D. Expert Opinions.

### 1. Childhood History.

Experts that will be presented at the evidentiary hearing ordered by the Court

48

will explain the impact that Petitioner's childhood and severe drug use had on his mental health. Petitioner suffers from a life long anxiety disorder. This disorder is the leading edge of the symptoms secondary to his history of abuse, trauma and family dysfunction. Experts will explain that severe anxiety is on the continuum of symptoms experienced by children with similar histories. Experts will explain that Petitioner suffers from features seen in ADD (Attention Deficit Disorder) and OCD (Obsessive Compulsive Disorder). These symptoms also are seen in those with similar histories. The trauma and dysfunction that marked Petitioner's early life can cause the survivors of such a history to have difficulty in focus (ADD); as often happens Dustin's compensated for this deficit by seeking a high level of order in his life (OCD). As such, these symptoms are a window into the larger pathology that plagued Petitioner as an adult.

Experts will testify that when children have parents who model criminal behavior, the chances that those children will follow suit rises dramatically. That fact was never presented to Petitioner's jury.

Experts will testify that the open and notorious criminal life of a parent can have a dramatic impact on children. This impact is similar in many ways to that experienced by children who are physically abused and who witness abuse, like Petitioner. The effects of an adult criminal lifestyle on a developing child are greatly

49

exacerbated when the adult model also engages in and verbalizes to the child violence or violent imagery. Experts will explain that this can have the same impact on the child as actually experiencing violence.

The durable psychological impact of the social history experienced by Mr. Honken is not really debatable in the mental health field. Demographically, children with such histories are grossly over-represented in the ranks of prison populations. That is because this type of history has an impact on the child's ability to trust, to make judgments, to control impulses and to judge the future consequences of their short term actions. These children are more likely to self-medicate with illegal drugs (as Petitioner eventually did). They suffer depression, other mood disorders, and experience severe emotional lability. Experts will testify that this is true of Mr. Honken.

### 2. Drug Abuse and Exposure to Neurotoxins.

Mr. Honken's social history mitigates all by itself. When added to the impact of his severe drug abuse, the effect is greatly amplified. Expert opinion at the hearing scheduled by the Court will show that Dustin's history of methamphetamine abuse can cause neurotoxicity. The impact of such significant use is to cause structural changes in the brain and associated changes in brain function. These changes begin within days of methamphetamine abuse and continue for months and years after all

50

methamphetamine use has ceased.

The expert opinion will show that it is well documented that certain chemicals coordinate and affect brain function. Two of these chemicals are serotonin and dopamine. Methamphetamine exposure at the levels consumed by Mr. Honken causes damage to dopamine production and regulation within days of initial exposure, and that damage can persist for months and years, even after complete cessation of use of the drug. Methamphetamine use is likewise toxic to serotonin, damaging its production and regulation, and causing long lasting serotonin depletion.

Methamphetamine abuse also causes damage to the frontal lobes of the brain. The neurotoxic impact of methamphetamine literally decreases the metabolism, and thus the functioning, of that area. The frontal lobes are where conscious decisions and judgments originate in the brain. Damage to the frontal lobes effectively removes the brakes from a person's behavior. Frontal lobe damage associated with methamphetamine abuse causes impaired judgment, poor choices, paranoia, aggression, impulsivity, repetitive and maladaptive decision-making, and damages an abuser's verbal memory and abstract learning capacity. Again, these effects can last for months and years following the cessation of use.

The same constellation of neurotoxic effects caused by methamphetamine abuse can also result from exposure to methamphetamine production. Neurotoxic

51

particles are released during methamphetamine "cooking," and persist in the air and on surfaces for days afterward. Those chemicals are absorbed through the lungs and skin, enter the blood stream, and cause the same damage to brain structure and functioning described above. The cumulative effects of exposure to both methamphetamine cooking and methamphetamine abuse cause even greater damage to the brain.

Expert opinion will show that the toxic, chemical, and structural brain damage caused by methamphetamine exposure directly affects behavior. The direct link between methamphetamine abuse and violent behavior is greater than for any other substance of abuse. Indeed, the majority of male methamphetamine abusers engage in violent behavior related to their methamphetamine abuse. The likelihood of a person committing a homicide is 900% greater for methamphetamine abusers, even when that probability is controlled for an abuser's criminal history, other drug abuse, and other factors. Although all methamphetamine abuse increases the likelihood of violent behavior, the likelihood is even greater where the abuser has had exposure to arrests and other dysfunction in his family of origin, and when the methamphetamine abuse is frequent and/or in higher doses.

Methamphetamine abuse can cause bizarre behavior and psychotic thought processes. Methamphetamine use also frequently causes significant sleep

52

deprivation, which itself can cause bizarre behavior and psychotic thought processes.

In short, Mr. Honken's decision-making and behavior, after his methamphetamine abuse began, reflected changes in his brain chemistry and brain functioning due to that abuse.

### 3. Combined Mental Health Impacts.

Expert opinion to be presented at the evidentiary hearing scheduled by the Court will demonstrate that Mr. Honken's life and history is highly mitigated. Opinions will be presented that his history, drug abuse and exposure to neurotoxins, significantly impaired his ability to appreciate the wrongfulness of his conduct and to conform his conduct to the requirements of the law. Combined, these conditions present a significant mental or emotional disturbance, which existed at the time of these offenses. Expert opinion will show that Mr. Honken's frontal lobes were compromised at the time of the offenses. His emotions were out of control. He lacked proper judgment-making capacity. His impulse control was virtually non-existent. In short, he suffered from a number of conditions and symptoms that are classically mitigating in the sentencing phase of a capital trial.

### E. Counsel's Deficient Performance.

Much of what has been described above – although not all – was known to counsel through the work of their mitigation specialist. Many of the facts and

53

theories explained above – again, not all – are contained in her file and were shared with counsel. The mitigation specialist implored trial counsel to retain a mental health expert to provide context for the fact finder about the impacts of Petitioner's childhood on his adult behavior. The specialist implored counsel to seek professional assistance in explaining how Jim Honken's modeling of his life of crime, deceit and violence, weighed heavily on the young Dustin Honken. Yet, counsel inexplicably failed to engage a mental health expert to explore and develop these issues.[3]

Counsel failed to investigate at all the import of drug abuse in Petitioner's background, and having not investigated, they neglected to seek expert opinions.

Undersigned counsel have learned that trial counsel may have made a decision not to retain an expert to evaluate and testify regarding Petitioner's social history because Government counsel told trial counsel that they would rebut any mental health presentation with Park Dietz, M.D. Counsel's ostensible decision not to even investigate mental health issues because any such presentation would be met by Dr. Dietz is not a reasonable tactic because it is based upon far less than full knowledge

---

[3]Trial counsel had Mr. Honken tested by a neuropsychologist who did not find noteworthy impairments. Expert opinion at the hearing will show, and Petitioner alleges, that the effects of methamphetamine use abates after a period of years. Thus, the fact that Mr. Honken did not show impairments in neurospychological testing at the time of trial is not inconsistent with his drug use and the related impairments at the time of the offenses.

54

of the relevant facts and opinions. In fact, Dr. Dietz was never actually retained and performed no evaluation of Petitioner. Moreover, the involvement of Government trial counsel in the realm of Petitioner's penalty phase mental health investigation and presentation would violate Federal Rule of Criminal Procedure 12.2, which requires that Government mental health work done related to capital sentencing be conducted by Government lawyers who are not part of and who are walled off from the trial team.

### F. Prejudice.

A determination of whether counsel's deficiencies with respect to the mitigation phase caused prejudice is a mixed question of law and fact. For now, Petitioner alleges that counsel's performance caused prejudice and reminds the Court that prejudice is established in the penalty phase if the unpresented mitigation could have led to a reasonable likelihood that even one juror would have voted for life. Petitioner will fully brief this issue at the direction of the Court.

55

**THE COURT'S PENALTY PHASE INSTRUCTIONS FAILED TO PROPERLY NARROW THE SCOPE OF THE JURY'S CONSIDERATION OF FUTURE DANGEROUSNESS AND FAILED TO GUIDE THE JURY'S WEIGHING OF AGGRAVATING AND MITIGATING CIRCUMSTANCES; COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT IN VIOLATION OF PETITIONER'S FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS.**

The Court's penalty phase instructions were erroneous in several respects. The Court's instructions on future dangerousness stated:

> Final 'Penalty Phase' Instruction No. 4 - Step Three: 'Non-Statutory' Aggravating Factors. . . Evidence that the defendant would be a danger in the future to the lives and safety of other persons may include *one or more* of the following: (a) specific threats of violence; (b) a continuing pattern of violence: (c) low rehabilitative potential; (d) lack of remorse; and (e) high custody classification.

Dkt. # 524, at p. 23. Thus, the jury was free to find future dangerousness from the mere fact that Petitioner had a high custody classification.

This instruction was problematic in view of the fact that Petitioner presented Dr. Mark Cunningham, "to help [the jury] understand some issues dealing with the Government's allegation about future dangerousness in this case." Tr., 3725. Dr. Cunningham testified generally as to the classification systems in federal prisons and regarding rates of homicides in prison. Additionally, he testified that the Security Designation and Custody Classification Manual of the U.S. Bureau of Prisons requires that inmates serving a life sentence, like Petitioner would be if not sentenced

56

to death, "shall be housed in a high-security-level institution." Tr., 3740. Thus, the Court's instruction endorsed the Government's view of high custody status and implicitly rejected Dr. Cunningham's opinion. Stated differently, this Court's instruction took sides with regard to whether a higher custody status was mitigating, as testified to by Dr. Cunningham. Since the jury found this aggravating circumstance, the instruction violated due process, Petitioner's right to a jury trial and the Eighth Amendment's narrowing requirements.

The Court also erred in failing to instruct the jury as to what standard of proof it should use in the process of weighing aggravating circumstances against mitigating circumstances. Due process and the Eighth Amendment require that before a capital jury may return a verdict of death, it must be convinced beyond a reasonable doubt of the relative weight of the aggravating and mitigating circumstances. The Court did not provide this guidance.

Trial counsel ineffectively failed to object to these errors. Counsel performed deficiently as there could be no possible strategic reason for failing to object. Indeed, with respect to future dangerousness, counsel argued against this aggravating circumstance stating in closing that Petitioner would not be a danger in prison. Tr., 3927. Yet counsel failed to object to the Court's instruction effectively directing a verdict on this aggravating factor. Petitioner was prejudiced by counsel's deficient

57

performance. There is a reasonable probability that had counsel objected the outcome of the penalty phase would have been different.

Appellate counsel's performance also was deficient. These instructional errors constitute plain error and should have been raised as such. At the time of the direct appeal, it was standard practice that appellate counsel in capital cases should seek to litigate all issues. Decisional law likewise recognizes that appellate counsel is ineffective for failing to raise a meritorious claim, where the claim would have been reviewed under the plain error standard. There was not, and could not be, any tactical or strategic reason for counsel not to raise this meritorious claim.

Trial and appellate counsel's failure to raise these instructional claims prejudiced Petitioner. The instructional error was plain. There was a reasonable likelihood of a different penalty verdict and/or a different outcome on direct appeal.

## CLAIM ELEVEN

### VICTIM IMPACT EVIDENCE PRESENTED TO THE JURY WAS RECEIVED IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.

Although so-called victim impact evidence is generally not precluded under the Eighth Amendment, the victim impact presentation in this case was problematic in several respects. It was far too emotional, highly charged, and speculative, and therefore was unduly prejudicial and failed to comport with the Eighth Amendment.

58

The highly charged nature of the testimony in this case even caused the Court to have an emotional reaction, which may have been seen by some number of the jurors, thereby tainting the reliability of the death verdict. In some instances, the Government presented an untrue picture of the impact of the death of one of the victims (DeGeus) and trial counsel ineffectively failed to challenge this false evidence. Finally, the Court's instruction failed to permit the jury to use the victim impact aggravating factor to truly narrow those deserving of the death penalty.

The victim impact evidence presented in this case was extraordinarily moving and emotional and accordingly, it was so unduly prejudicial that it rendered the penalty hearing fundamentally unfair, in violation of due process of law and the Eighth Amendment. This Court has all but acknowledged this to be the case:

> I have already presided over the "penalty phase" in the companion case against Dustin Honken. This case will likely involve "victim impact" evidence that is substantially similar to the "victim impact" evidence in Honken's case, because this case involves the same alleged murders of the same victims. I can say, without hesitation, that the "victim impact" testimony presented in Honken's trial was the most forceful, emotionally powerful, and emotionally draining evidence that I have heard in any kind of proceeding in any case, civil or criminal, in my entire career as a practicing trial attorney and federal judge spanning nearly 30 years. Indeed, I cannot help but wonder if *Payne v. Tennessee*, 501 U.S. 808 . . . (1991), which held that victim impact evidence is legitimate information for a jury to hear to determine the proper punishment for capital murder, would have been decided the same way if the Supreme Court Justices in the majority had ever sat as trial court judges in a federal death penalty case and had observed first hand, rather than

59

through review of a cold record, the unsurpassed emotional power of victim impact testimony on a jury. It has now been over four months since I heard this testimony in the Honken trial and <u>the juror's sobbing during the victim impact testimony still rings in my ears</u>. This is true even though the federal prosecutors in Honken used admirable restraint in terms of the scope, amount, and length of victim impact testimony. To pretend that such evidence is not potentially unfairly prejudicial on issues to which it has little or no probative value is simply not realistic, even if the court were to give a careful limiting instruction. Rather, such potent, emotional evidence is a quintessential example of information likely to cause a jury to make a determination on an unrelated issue on the improper basis of inflamed emotion and bias-sympathetic or antipathetic, depending on whether one is considering the defendant or the victims' families. *Cf. Gabe*, 237 F.3d at 959-60 (defining "unfair prejudice" for purposes of Rule 403 as " 'an undue tendency to suggest decision on an improper basis'").

*United States v. Johnson*, 362 F. Supp. 2d 1043, 1106-07 (N.D. Iowa 2005).

It also was speculative in a manner that violated the Eighth Amendment. For instance, Rhonda Francis testified that she was the sister of victim Terry DeGeus. In addition to her testimony about the emotional impact of the death of her brother, she compared the character and emotional makeup of her late brother with her father. Tr., 3477. This type of testimony was irrelevant to any issue before the jury. Counsel failed to object to it. Then, she testified that the emotional upheaval caused by the death of her brother caused her father to develop diabetes. Tr., 3480. She also testified that "as blood pressure goes, I think most of us have high blood pressure now, so it's been a long, long journey." *Id.* This testimony was irrelevant, highly

60

prejudicial and well beyond this lay witness's expertise to offer such an opinion. Again, counsel failed to object.

Ms. Francis also testified that Mr. DeGeus was "always kind and always loving." Tr., 3482. This testimony was belied by the fact that Mr. DeGeus was a known habitual violent criminal who dealt drugs and acted as an enforcer in the various enterprises. The prosecution should not have participated in the presentation of such obviously inaccurate testimony and defense counsel – who knew this testimony to be false – should have presented the truth to the jury either through cross examination or through extrinsic evidence.

Similarly improper, speculative and highly prejudicial testimony was received from Kathy Nicholson, the ex-wife of victim Greg Nicholson. She described the alleged impact of Mr. Nicholson's death on his father: "his health started going bad. He ended up having to retire early. The stress of the situation worsened him being sick . . . He passed away two weeks after we buried Greg." Tr., 3503-04. Again, this testimony was speculative and constituted improper lay opinions about the impact of stress on the father's health, retirement and ultimate death. Defense counsel ineffectively failed to object to this testimony, or to seek to correct it through cross examination or by use of extrinsic evidence.

Robert Milbrath testified that he was the brother of Lori Duncan. Among other

61

things, he testified that she was "very much against [drugs]. She did not want to be around drugs at all. She did not want to know anybody or have her girls around drugs at all." Tr., 3510. This testimony was obviously in significant conflict with the fact that she dated men who were deeply involved in drugs, including Mr. Nicholson. Counsel ineffectively failed to correct this testimony, either through cross examination, extrinsic evidence or argument.

Testimony about the loss of Lori Duncan and her two minor children was obviously emotionally wrenching. Counsel failed to properly move to sanitize this testimony so as to bring it within the parameters of the Fifth and Eighth Amendments. Displays of the children in their Halloween customs (Tr., 3514) and testimony about the obvious "devastation" (Tr., 3516) their death had on the family could have only caused undue prejudice.

If the testimony was not heart-wrenching enough, the Court engaged in an emotional display of its own. This display occurred during the testimony of several of the impact witnesses (Tr., 3669, counsel making record of their observations). While the Court vigorously disputed counsel's statement that they saw the Judge crying during portions of the testimony, the Court did not dispute that "there was some emotion in my voice" as "it was very emotional testimony" Tr., 3674.

Significantly, the Court also observed that while it did not want to take

62

evidence at that time, that taking of evidence on this issue "may come and probably will come at a later day." *Id.* Accordingly, with the Court's permission, counsel will seek to develop the facts related to this incident and present testimony about it at a later date.

The Court's instruction on victim impact evidence failed to provide the constitutionally required narrowing concepts to the jury. It stated:

> For Counts 8 through 17, the effect of the crime upon the victim's family was injurious. The prosecution must prove that the murder of the victim deprived the surviving members of the victim's family of the benefit of having the victim in their lives and as a result, their lives have changed and they have experienced significant emotional trauma, and that such injurious effect tends to support imposition of the death penalty.

Dkt. # 524, at p. 24). This instruction failed to abide the constitutional mandate of aggravating circumstances, that is, to narrow those eligible for death. Any death "deprives the surviving family members" from the benefits of having the victim in their lives, and thus the instructions and factor failed to narrow in violation of the Eighth Amendment.

Trial and appellate counsel ineffectively failed to object to or otherwise litigate the issues arising from the victim impact evidence. These failures caused Petitioner prejudice at trial and on appeal.

63

**THE GOVERNMENT VIOLATED PETITIONER'S RIGHTS UNDER THE EIGHTH AMENDMENT AND THE DUE PROCESS CLAUSE BY PRESENTING INCONSISTENT ARGUMENTS AT HIS TRIAL AND HIS CO-DEFENDANT'S TRIAL; COUNSEL WERE INEFFECTIVE UNDER THE SIXTH AMENDMENT FOR FAILING TO DISCOVER AND PRESENT READILY AVAILABLE EVIDENCE THAT WAS PRESENTED BY THE GOVERNMENT AT HIS CO-DEFENDANT'S TRIAL.**

The Government repeatedly argued during Angela Johnson's trial that Johnson was the more culpable of the two defendants in this case for purposes of punishment. The Government elicited substantial testimony that Petitioner had no history of violence prior to his meeting Johnson. Indeed, the Government went so far as to suggest that Petitioner was not even capable of murder absent the manipulation and negative influences of Johnson. Despite the Government's own assertions at Johnson's subsequent trial that Johnson was a manipulator without whose influence these murders may never have happened, the Government followed a much different course during Petitioner's trial. There, the Government described Petitioner as the manipulator and strenuously argued that death was therefore the only appropriate punishment in his case. The Government's improper change of tactics violated Petitioner's Eighth Amendment and due process rights.

The Government asserted on more than one occasion during Johnson's trial that the murders would not have even happened but for Johnson's influence over

64

Petitioner. During its argument at the eligibility phase of Johnson's trial, for example, the Government argued the following to the jury:

> Ask yourself absent both of them coming together, Dustin Honken being the planner in this case and obviously with the motivation to kill and Angela Johnson who was somebody who acts, whether without her intentional conduct and prodding along Dustin Honken whether this murder would have happened. But for her, Dustin Honken couldn't have made entry into that house. Greg Nicholson would have seen him at that point and resisted.
>
> But for her, there was no way to get Terry DeGeus out to a point where he could be killed. But for her, Dustin Honken, he could have come up with a gun maybe someplace, but would he have? Could he have? It's that conduct by the defendant in this case that led to these murders.

Johnson Tr., 2465.

Further, during the Government's case in aggravation against Johnson, it asked Alyssa Nelson, Petitioner's sister, the following question: "[k]nowing what you know about his personality absent some outside influence, can you see Dustin Honken murdering five people?" *Id*. at 2679. While the Court sustained an objection to this question, the fact that the Government even asked this question speaks volumes.

The Government also clearly believed that as between Petitioner and Johnson, it was Johnson who was the manipulator, not Petitioner. In arguing for the potential admission in rebuttal of a series of threatening, profanity-laden telephone messages that Johnson had left for Petitioner, the Government made the following argument:

65

> Your Honor, while at least arguably this advances the Government's aggravating factor of future dangerousness, we are offering it much more in response to the defense assertions in their mitigating factors that this defendant had a mitigating role because she was under the influence and under duress and under the direction of Dustin Honken.
>
> And what this tape does more than anything else is tells you exactly what the relationship was between those two people. I mean, she's – this is a guy who murdered five people, and she's threatening to kick his ass, he better get him (sic) home, that she told him not to fuck with her.
>
> I mean, this is somebody who's not led, who's not been under duress or under the influence of Dustin Honken. This is somebody who very much can stand up for herself, if anything else, is the one telling Dustin Honken what to do, where to go, where to be. And so I think this opens up a huge window into what the relationship really was like between them.

Johnson Tr., 2512-13.

Indeed, while Johnson's defense submitted as a proposed mitigating factor at the penalty phase the alleged fact that Johnson acted under the substantial influence of Petitioner, the Government argued that it did not "think there was a shred of evidence to suggest that at any point she was under substantial influence of Dustin Honken." *Id*. at 3979. The Court agreed, and did not even let Johnson submit this as a potential mitigating factor to the jury. *Id*. at 3780.

Further, the Government on at least two occasions during its penalty phase closing argument in Johnson's trial set forth its position that Johnson was more morally culpable, thus more deserving of the death penalty, than Petitioner:

66

When you're back thinking about role in the offense, do not, do not, just jump to the conclusion that the person who pulls the trigger is the person who's the most morally culpable for the crime. Think about what you know about this defendant and her violence, her impulsivity, her ability to manipulate Honken, Terry DeGeus. And ask yourself this question: Is it more morally culpable to pull the trigger, or is it more culpable for someone to egg on, to push?

Johnson Tr., 4026; *see also id*. at 4079-80. The Government reaffirmed this position during its argument on Johnson's motion for a new trial, in which it argued that "[p]rior to Dustin Honken meeting Angela Johnson, he wasn't a violent person," however Johnson "was a violent person. She was angry, she was volatile. When you come down to it, it was Angela who pushed it."

Further, the Government presented evidence that, prior to meeting Johnson, Petitioner had never been violent. *Id*. at 323-24; 856-57; 858; 914-15 (Cutkomp testifies that without Johnson's influence, Petitioner may never have been capable of murder); *see also id*. at 977-78; 1056-57; 1521; 2668-69; 2672; 3203-4; 3271. This evidence came from an abundance of sources, including several who would, if anything, have had a bias against Honken and in favor of Johnson, such as Johnson's siblings and ex-husband (with whom she shared a child and was on friendly terms).

The Government also elicited testimony that, unlike Petitioner, Johnson had a lifelong history of violence and threatening behavior. The government's evidence included that Johnson had, for example, expressed her jealousy of Kathy Rick by

67

repeatedly threatening to kill her, attempting to break into her house, and vandalizing her car. *Id*. at 779; 781; 2637-39. The government also presented evidence that Johnson had threatened to kill Dan Cobeen, *id*. at 709, had threatened to kill a corrections officer at the Benton County Jail, *id*. at 2777, and had made an oblique threat to Jeff Honken and his children. *Id*. at 369-70. The Government elicited testimony that Johnson's threats were not merely idle; the evidence revealed that she photographed people present at court proceedings, *id*. at 2679-81, and made efforts to ascertain the name, make of car, and home address of the Benton County corrections officer. *Id*. at 2777. The Government also elicited testimony that Tim Cutkomp was more afraid of Johnson than of Petitioner, *id*. at 2621; 4026-27, and that on one occasion Petitioner awoke to find Johnson holding a gun to his head. *Id*. at 2678-79.

According to the Government's evidence, Johnson's involvement in the methamphetamine business also both predated and postdated her acquaintance with Petitioner. For example, while Johnson was attempting to further her methamphetamine business (after Petitioner had already been incarcerated on his 1996 federal drug charges), Johnson's eyes "lit up" when discussing the prospect of becoming a mafia hit woman with an undercover law enforcement officer. *Id*. at 2740.

68

Despite all of this, the Government repeatedly pressed the theme during Petitioner's trial that he was a violent manipulator who was supremely deserving of the ultimate punishment. The Government's contrary views and evidence from Johnson's trial were directly relevant to Petitioner's culpability and numerous disputed issues at Petitioner's penalty phase, including the question of his future dangerousness in prison. This discrepancy violated Petitioner's Eighth Amendment and due process rights.

The evidence presented by the Government at Johnson's trial was equally available to Petitioner's counsel and could have been presented at his trial. Petitioner's counsel inexplicably failed to present this available evidence. Counsel had no strategic basis for failing to introduce this evidence, as it was consistent with and supportive of counsel's chosen theory of defense at both the guilt and penalty phases. Counsel's omissions prejudiced Petitioner, as there is a reasonable probability that absent this failure, at least one juror would have voted for a life sentence for Petitioner on all five murders.

**TRIAL COUNSEL'S STIPULATION TO THE CIRCUMSTANCES REGARDING THE ALLEGED ACQUISITION OF MAPS ALLEGEDLY GENERATED BY ANGELA JOHNSON IN LIEU OF TESTIMONY FROM ROBERT MCNEESE, VIOLATED THE FIFTH AND SIXTH AMENDMENTS. APPELLATE COUNSEL'S FAILURE TO RAISE CLAIMS RELATED TO THE STIPULATION WAS INEFFECTIVE.**

Rather than insist on the presentation of the testimony of Robert McNeese, a Government agent with well-documented credibility problems, and of so-called "handwriting and fingerprint experts," trial counsel agreed to the following stipulation offered by the Government:

> During August and September of 2000, Angela Johnson was in the Benton County Jail awaiting trial on federal criminal charges relating to the deaths of Greg Nicholson, Lori Duncan, Kandi Duncan, Amber Duncan, and Terry DeGeus.

> While in the Benton County Jail, Johnson became acquainted with a fellow jail inmate named Robert McNeese. McNeese was and currently still is serving a federal sentence of life in prison on matters unrelated to the case. Johnson and McNeese discussed Johnson's case. As a ruse, McNeese told Johnson that she could escape responsibility for these deaths if McNeese could arrange to have some other inmate who was already serving a life sentence falsely claim responsibility for murdering the five victims.

> McNeese told Johnson that in order to make the confession believable, the other inmate would need to be able to furnish proof of his involvement by leading authorities to the victims' bodies.

> Johnson prepared and provided to McNeese certain maps and notes describing the location where the bodies of the five victims were buried.

70

McNeese then turned over these maps and notes, Government's Exhibits 310, 311, and 312, to the Iowa law enforcement authorities.

Exhibits 310, 311, and 312 have been analyzed at the Iowa DCI criminalities laboratory. Both fingerprint and handwriting analysts conclude that Angela Johnson authored or could not be eliminated as authoring Exhibits 310, 311, and 312.

Tr., 2320.

The stipulation to McNeese's testimony regarding the circumstances of the alleged acquisition of the maps and to the conclusions of the handwriting and fingerprint analysts was the only evidence establishing the foundation and authenticity of the maps. By agreeing to this stipulation, counsel forfeited the opportunity to confront, cross examine and bring to the jury's attention a number of meritorious challenges to the core of the stipulation, *i.e.* that the maps were actually generated by Angela Johnson, including:

- that McNeese has a well-known history of cooperation with the Government in exchange for benefits;

- some of McNeese's past cooperation led to the presentation of false evidence;

- permitting the false impression to go to the jury that McNeese received no benefit from his cooperation in this case;

- relinquishing the opportunity to challenge the handwriting and fingerprint opinions – the former being "junk" science and the

71

latter being subject to challenge.[4]

Trial counsel's stipulation also unreasonably gave up the legal challenge to what constituted hearsay evidence, specifically the potential testimony from McNeese that Johnson told him what the maps represented.

Thus, counsel gave up much in this stipulation by way of challenging the admissibility and/or credibility of the testimony that provided the context, background and meaning of the maps. Because counsel otherwise vigorously challenged the admissibility of the maps and the accompanying handwritten notes allegedly provided to McNeese by Johnson, it is clear that they recognized the damaging impact of the maps and their significance to the Government's case. Tr.,

---

[4]The National Academy of Sciences published a report *Strengthening Forensic Science in the United States: A Path Forward* ("NAS Report") (2009), which points out that handwriting analysis is not based on sound science) (NAS Report at 167: "The scientific basis for handwriting comparisons needs to be strengthened."), and which points out the many ways in which fingerprint testimony is subject to challenge (id. at 142 "Given the lack of validity testing for fingerprinting; the relative dearth of difficult proficiency tests; the lack of a statistically valid model of fingerprinting; and the lack of validity standards for declaring a match, [] claims of absolute confidence in identification are unjustified.") The foundation for the NAS Report's conclusions were available to trial counsel at the time of the stipulation and they were ineffective for failing to consider and act upon these basis. Alternatively, if counsel's unawareness of these bases for challenging the two "expert" opinions was excusable, the NAS Report constitutes newly discovery evidence, which could not have been ascertained through the exercise of due diligence. *See* Claim Nineteen.

2342-2361.[5]  Therefore, trial counsel had no sound strategic or tactical reason for entering into this stipulation – they wanted to keep out the maps and related evidence in any way they could.

Had trial counsel required McNeese to testify, cross-examination would have shown that McNeese's testimony regarding the maps was not credible for a variety of reasons, including that McNeese had a long history of cooperating with the Government, including the United States Attorney's Office for the Northern District of Iowa, and that he received benefits from the Government for his cooperation in this case. *See United States v. Johnson*, 196 F. Supp. 2d 795, 802-06 (N.D. Iowa 2002).

Moreover, cases that had been decided at the time of this stipulation provided a basis for objecting to the testimonial hearsay of the handwriting and fingerprint witnesses.

Petitioner was prejudiced by trial counsel's failure.  By stipulating to the hearsay statements, trial counsel foreclosed any opportunity to explore McNeese's relationship with the Government, his relationship with Johnson, including Johnson's responses to his advances, and to challenge the authenticity of the maps.  The admission of these statements without subjecting McNeese or the handwriting and

---

[5]  As result of trial counsel's arguments, the notes, which further incriminated Johnson, were withdrawn by the Government and not offered into evidence.  Dkt. # 770-2 (Exhibit List).

73

fingerprint analysts to rigorous cross-examination was prejudicial.

Appellate counsel's performance also was deficient and prejudicial. The admission of McNeese's testimony and to the analysts' conclusions through hearsay was plain error and should have been raised as such on appeal. Appellate counsel challenged the admissibility of the maps, arguing the trial court erred in admitting the maps in violation of the Sixth Amendment and the Federal Rules of Evidence. Counsel, however, did not challenge the admissibility of hearsay statements contained in the stipulation to by counsel. There was not, and could not be, any tactical or strategic reason for counsel not to raise this meritorious claim. Appellate counsel's failure to raise the issue prejudiced Petitioner. The confrontation error was plain, and would have resulted in the appeals court vacating Petitioner's convictions and/or vacating his death sentences.

74

## CLAIM FOURTEEN

**THE GOVERNMENT VIOLATED THE FIFTH AMENDMENT WHEN IT REPEATEDLY ELICITED INADMISSIBLE TESTIMONY REGARDING PETITIONER'S ALLEGED INVOLVEMENT WITH DRUGS AND VIOLENCE THAT WAS TOO REMOTE TO BE RELEVANT. TRIAL AND APPELLATE COUNSEL INEFFECTIVELY FAILED TO OBJECT TO OR LITIGATE ALL OF THE INSTANCES OF MISCONDUCT.**

On direct examination of Scott Gahn, the prosecutor twice asked him questions concerning Petitioner's alleged drug distribution prior to the time of the charged conspiracy in this case (1993-2000), and the original case that was dismissed (1991-1993). First, Gahn testified that Mr. Honken asked him if he knew anyone who would sell cocaine when they worked together at Wellborn Industries. Tr., 188-90. Trial counsel immediately objected, arguing that time frame – summer 1988 – was too remote to be relevant. The Court agreed and ordered the jury to disregard any testimony from Gahn about drug activity during that time period. *Id*. at 190. Second, Gahn testified that he once allegedly owed Petitioner a drug debt and implied that Petitioner was a dangerous person to shortchange. *Id*. at 192-93. Again counsel objected, and again, the Court ruled that the time period – which Gahn could recall only as some time in 1989, 1990 or 1991 – was too remote to be relevant. *Id*. at 193-94. The Court also instructed the jury to disregard testimony of drug activity that was from "a time frame earlier than 1991." *Id*. at 204-05.

75

Despite the Court's rulings, the prosecutor elicited on redirect of Gahn the same testimony that the Court had already precluded on his direct examination:

Q. How do you know that to be true?

A. There was two times that Dustin ever made me real nervous, and you get that gut feeling where you know something's a little bit off. One was when he told me to pay up for the money – pay him the money for the coke that I did. I had a little feeling that if I didn't pay this guy his money, it could be bad news . . .

*Id*. at 225-26. This time, however, trial obviously failed to object to the prosecutor's misconduct and Gahn's testimony, and the jury heard this improper evidence.

A prosecutor has the duty to guard against statements by a witness containing evidence that the prosecutor knows, or should know, to be inadmissible. When a prosecutor believes a witness may give an inadmissible answer during his examination, he must warn the witness to refrain from making such a statement, or avoid asking that potential offensive question. It is plain that in this instance the prosecutor deliberately asked a question on redirect examination that he knew, or should have known, would elicit the same answers that the Court had previously ruled inadmissible. The Government's decision to elicit this testimony not once, but three times, serves to show that the prosecution was deliberately flouting the Court's rulings. This conduct violated due process of law.

Trial counsel were ineffective for failing to object and for failing to request a

76

curative instruction as to the instance on redirect examination. Given counsel's prior objections, counsel wanted to prevent the jury from hearing evidence of Petitioner's alleged drug activity prior to the time of the charged conspiracy. There was no reasonable strategic reason for counsel's failure to object the third time the prosecutor elicited this improper testimony, especially in light of the Court's clear rejection of such evidence. *See id.* at 194 ("And so I'm having a hard time understanding how a lot of the stuff that happened four or five years earlier is relevant.").

Trial counsel also were ineffective for not properly raising this claim in its Motion for a New Trial. In that motion, counsel argued that Gahn evaded the Court's evidentiary rulings and testified that Petitioner used drugs on redirect examination. As the Court noted in its opinion, trial counsel did not cite to any pages of the record to support its claim. *United States v. Honken*, 381 F. Supp. 2d 936, 1004 (N.D. Iowa 2005). The record makes clear that the evidentiary ruling that the prosecutor and Gahn evaded was the prohibition of testimony concerning Petitioner's alleged drug distribution prior to 1991.

Petitioner was prejudiced by trial counsel's failure. The evidence was irrelevant to the crimes charged and constituted improper propensity evidence that suggested that because Mr. Honken dealt drugs prior to 1991, it was likely that he dealt drugs during the pendency of the conspiracy. Moreover, the inadmissible

77

evidence bolstered Gahn's characterization of Mr. Honken's behavior on the day of Greg Nicholson's disappearance by comparing Gahn's "feelings" on that day to his earlier "feelings." *See* Tr., 226 ("I had the same feeling the day he was in my club looking for Greg[.]") Without this impermissible bolstering, Gahn's testimony would have been significantly less credible, and it is reasonably likely that the jury would have discredited his testimony about his meeting with Mr. Honken during the time of the alleged conspiracy that was being tried.

Appellate counsel were also ineffective for failing to raise this issue on appeal. The prosecutor's disregard of the Court's ruling was clear from the record. At the time of the direct appeal, it was standard practice that appellate counsel in capital cases should seek to litigate all issues, whether or not previously presented, that are arguably meritorious. Decisional law extant at the time of the direct appeal required the same. There was not, and could not be, any tactical or strategic reason for appellate counsel not to raise this meritorious claim. Appellate counsel's failure to raise the issue prejudiced Petitioner. The error was plain, and would have resulted in the appeals court vacating Petitioner's convictions and/or vacating his death sentences.

Because of the prosecutor's misdeeds, and trial and appellate counsel's failure to properly object and raise this issue, the jury also was permitted to balance these

78

additional bad acts in the penalty phase.  Accordingly, the Fifth and Sixth

Amendment violations described above also invalidate Petitioner's death sentence

under prevailing Eighth Amendment precedent.

**CLAIM FIFTEEN**

**PETITIONER WAS DENIED HIS RIGHTS TO DUE PROCESS, A FAIR TRIAL AND THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE THE JURY HEARD INADMISSIBLE EVIDENCE OF PETITIONER'S PRIOR BAD ACTS AND THE TRIAL COURT FAILED TO GIVE THE JURY A CAUTIONARY INSTRUCTION CONCERNING THAT EVIDENCE.**

The Government introduced detailed and extensive evidence of Petitioner's

alleged escape attempt from Woodbury County Jail that was unrelated to the

offenses charged.  Introduced as "intrinsic evidence" and under Federal Rules of

Evidence 404(b), purportedly relevant to Counts 6 (soliciting Dean Donaldson and

Anthony Altimus to murder Timothy Cutkomp)[6] and Count 7 (conspiracy to

tamper with witnesses and to solicit the murder of witnesses) of the superseding

indictment, this evidence was not necessary to prove these counts and its relevance

was marginal at best.  On the other hand, it served the improper purpose of

showing propensity and should have been excluded under Rule 404(b) and under

Rule 403 on the ground that any probative value was substantially outweighed by

---

[6]During trial, the prosecution withdrew the portion of this charge alleging that Petitioner solicited the murder of Daniel Cobeen, and this charge only involved the alleged solicitation of the murder of Cutkomp.  Dkt. # 512 at 51.

79

the prejudicial effect.  The Court permitted the introduction of this evidence because counsel, while objecting, failed to argue the proper basis for excluding it.

The prosecution called three jailhouse witnesses, each of whom received some benefit from the Government in return for their cooperation, to testify regarding the alleged escape attempt.[7]  Dennis Putzier testified that Petitioner asked to participate in Putzier's planned escape after he learned that Putzier had broken through the bricks in his cell.  Tr., 1292; 1303-06; 1315-1320.  Terry Bregar testified that Petitioner planned to escape with Putzier and that he saw Petitioner chiseling bricks in his cell.  Tr., 1399-1405.  Dennis Frye, who had known Putzier since 1994, also testified that he noticed Petitioner using a broken door handle to chip away at the bricks in his cell.  Tr., 1431-33.  In addition, the Government introduced several exhibits from the Woodbury County Jail, including 25 photographs.

Counsel moved *in limine* to preclude the Government from introducing this evidence.  The Government claimed that the escape attempt was "inextricably intertwined" with Counts 6 and 7.  The Government argued that Mr. Honken's "motive for killing the witnesses was to avoid service time in prison" and thus his

---

[7]This jailhouse informant evidence has been further compromised by the Government's due process violations set forth in Claim Three, above.

attempt to escape custody was evidence supporting that motive. Dkt. # 297 at 4. The Court accepted this argument. *United States v. Honken*, 378 F. Supp. 2d 970, 1002 (N.D. Iowa 2004). Alternatively, it said the testimony was admissible under Rule 404(b) to establish Mr. Honken's intent and plan to murder or tamper with witnesses. *Id*. And, under Rule 403, the probative impact of the evidence would not be outweighed by undue prejudice, relying in part on the Government's assurances that it would not conduct a "mini-trial" on the nature of the escape attempt. *Id*. at 1003.

Even accepting the jailhouse witnesses' uncorroborated testimony, the evidence did not show that the alleged escape attempt was in furtherance of the solicitation and conspiracy charges, let alone inextricably intertwined with them as the Court found. The Government posited that Petitioner attempted to escape to kill Donaldson. However, even if Petitioner wanted to escape to kill Donaldson for not killing Cutkomp, the escape was not an integral part of the immediate context of the crimes charged but, rather, was a separate and distinct crime. For this reason, the alleged escape attempt was not intrinsic to Counts 6 and 7, nor was it relevant to prove Petitioner's intent and plan to murder or tamper with witnesses.

The alleged escape attempt also should have been excluded under Rule 403 because the undue prejudice it caused Mr. Honken vastly outweighed any conceivable probative value it might have had. Moreover, the Government had other witnesses, including Putzier and Bregar, who testified to Mr. Honken's solicitation of Donaldson and Altimus. Thus, there was no need to use the escape attempt under the theory that it would somehow indirectly prove Mr. Honken's support for the conspiracy.

The erroneous admission of this evidence was not harmless because it likely exerted a substantial influence on the jury's guilty verdicts on the capital charges. The remaining, untainted evidence was not overwhelming, but was plagued by significant gaps and conveyed by witnesses of questionable credibility. Further, the Court did not give, nor did trial counsel request, a limiting instruction that the evidence was to be considered only as to Counts 6 and 7 of the indictment, which could have lessened the danger of any unfair prejudice arising from the erroneous admission of Petitioner's prior bad acts. Petitioner was prejudiced at sentencing because the jury could consider the alleged escape attempt as evidence that Mr. Honken posed a continuing threat even while incarcerated, and undoubtedly balanced it in its ultimate death penalty verdict.

Trial counsel were ineffective for failing to object to the admission of the evidence under Rule 404(b) and the case law defining "intrinsic" evidence and for failing to request that the Court instruct the jury as to the narrow purpose for which the evidence was admitted. Trial counsel could not have had a strategic or tactical reason for failing to make the proper objections or requesting the limiting instruction.

Nor could counsel have had a reason for failing to renew its objection to preclude evidence of the alleged escape attempt. Counsel put on three witnesses – Lt. Lynette Redden, David Amick, and Thomas Steven Mullin – to show that there was no evidence that Mr. Honken attempted to escape from Woodbury County Jail and that he was not charged with a crime or violation of jail rules for the alleged attempt. Counsel were aware of the danger that the jury would view the escape as evidence of Mr. Honken's propensity to commit crimes and thus had no reason not to forcefully object to its presentation at trial. Trial counsel likewise had no strategic or tactical reason for not objecting to the Court's failure to provide the jury with an appropriate limiting instruction.

Petitioner was prejudiced by trial counsel's failure. For the reasons described above, there is a reasonable likelihood that the jury, without proper guidance from the Court, considered evidence of the alleged escape attempt as

83

propensity and bad character evidence and that it would not have would not have reached guilty verdicts on the capital charges and would not have sentenced Petitioner to death on any counts, if trial counsel had not performed deficiently.

Appellate counsel also were ineffective for failing to raise this claim on appeal. The Court's erroneous admission of this evidence was plain error and should have been raised as such. At the time of the direct appeal, it was standard practice that appellate counsel in capital cases should seek to litigate all issues, whether or not previously presented, that are arguably meritorious. Similarly, prevailing case law required counsel to raise colorable issues on direct appeal. There was not any tactical or strategic reason for counsel not to raise this meritorious claim. Appellate counsel's failure to raise these issues prejudiced Petitioner. The Court's error was plain, and would have resulted in the vacation of either Petitioner's convictions and/or death sentences.

### CLAIM SIXTEEN

**TRIAL COUNSEL INEFFECTIVELY FAILED TO PRESENT ABUNDANT, READILY AVAILABLE EVIDENCE THAT WOULD HAVE SUPPORTED THEIR THEORY OF DEFENSE.**

Counsel's theory of defense at trial was to suggest that Terry DeGeus was responsible for the deaths of Greg Nicholson and the Duncans, and then later was killed due to his involvement in their deaths. Abundant evidence was at counsel's

84

fingertips, some of it requiring only minimal investigation and some of it actually present in discovery provided by the Government, which counsel could have used to support this theory and to establish a reasonable doubt in the minds of the jury. Despite the ready availability of evidence casting suspicion on DeGeus, counsel presented only the thinnest of threads to support their chosen theory and cast doubt on the Government's case. Had counsel presented this additional available evidence, there is a reasonable probability that the jury would have found Petitioner not guilty. Counsel were ineffective and Petitioner's Sixth Amendment rights were violated.

Terry DeGeus was a violent, paranoid, hyper-aggressive methamphetamine dealer and user. DeGeus had both the motive and the opportunity to kill Greg Nicholson, and he was the primary suspect of law enforcement agents for years. While it was certainly a reasonable strategy for counsel to attempt to shift the jury's focus onto DeGeus, it was not reasonable for counsel to fail to follow through on their chosen theory by supporting it with available evidence.

Counsel could have introduced the very evidence that made DeGeus a primary suspect of multiple law enforcement agencies for years. This evidence included DeGeus's activities at and around the time of the Nicholson/Duncan

85

disappearances, along with DeGeus's suspicious actions and demeanor at around this time, which were described by numerous witnesses.

Law enforcement officers determined that DeGeus was employed at the time of the Nicholson/Duncan murders by his father's excavation business. Officers determined that DeGeus had in fact been involved in an excavation on the specific date of disappearance of Nicholson and the Duncans, and their suspicion of DeGeus was so strong that they thought it prudent to examine this excavation site as a possible location of the bodies. Over the course of two days in 1997, law enforcement officials did in fact complete this excavation with the aid of cadaver dogs. Law enforcement's suspicion of DeGeus did not end there. In 1999, investigators decided to re-excavate the same site, again with the aid of cadaver dogs, in an attempt to find the bodies.

Law enforcement had good reason to suspect DeGeus. Counsel could have presented evidence that DeGeus had at least two independent reasons for wanting to harm Nicholson: first, because Nicholson was a competitor in the Mason City area meth dealing world, and second because Nicholson's decision to cooperate with authorities would also have had the potential to send DeGeus to prison for a lengthy term. DeGeus was acutely aware of this fact, as he was constantly asking whether or not a grand jury subpoena had arrived at his home.

86

According to nearly every witness interviewed by law enforcement, DeGeus was particularly violent and aggressive. Counsel could have presented, for example, evidence of multiple instances of serious physical and verbal abuse directed towards Angela Johnson, including multiple occasions on which he threatened to kill her. Counsel could also have presented evidence of DeGeus stalking Johnson and breaking into her home.

Johnson was not the only target of DeGeus's harassment, however. Numerous other witnesses could have described DeGeus's violent, paranoid, and harassing behavior. For example, DeGeus's ex-wife, Wendy Jensen could have testified that DeGeus once threatened to kill her with a shotgun on Christmas, and then threatened to kill himself. DeGeus also at one point "had taken on five cops at one time and had won," according to Jensen. Jensen was so afraid of DeGeus that after Johnson broke up her marriage, she sent Johnson a card to thank her, saying that her divorce from DeGeus was the best thing ever to happen to her. After they divorced, Jensen got as far away from DeGeus as she could. Jensen also felt as though Johnson was holding something over DeGeus's head.

DeGeus may have been suspected in other murders and also threatened to kill Rich Gerdes, whom he suspected of stealing his daughter's piggy bank. DeGeus's reaction to this supposed theft was to take Gerdes out on a country road

87

and threaten him with a gun. Another person on the list of people DeGeus threatened to kill was Cristi Gaubatz's ex-husband.

DeGeus was also a heavy abuser of methamphetamine, along with alcohol and other substances of abuse, which only increased his violence, aggression, and paranoia. DeGeus frequently presented, especially around the time of the Nicholson/Duncan disappearances, as manic, paranoid, and disheveled.

While counsel did present some evidence to cast suspicion on DeGeus, it paled in comparison to the mountain of evidence they could have presented. Numerous law enforcement agencies targeted DeGeus as their primary suspect for years and they had good reason for doing so. Had counsel presented some of the facts that led law enforcement agencies to suspect DeGeus, there is a reasonable probability that the jury would have had a reasonable doubt as to Petitioner's guilt.

Counsel's failure to introduce this evidence prejudiced Petitioner. There was absolutely no physical evidence linking Petitioner with the Duncan home or the crime scene. The Government's case was entirely circumstantial and relied heavily on the testimony of jailhouse informants and other individuals (such as Cristi Gaubatz and Timothy Cutkomp) who were similarly seeking to curry favor with the Government to escape their own criminal liability. Many of the Government's key witnesses admitted to having previously committed perjury

88

and/or lied to investigators.  Had the defense followed through on their attempt to cast suspicion on DeGeus, there is a reasonable probability that the jury would have reached a different verdict.

Counsel's failures also detrimentally affected Petitioner's sentence.  While the prospect of residual doubt was submitted to the jury as a proposed mitigating circumstance, no juror found the existence of this mitigator.  Had counsel put up the evidence outlined above, there is at least a reasonable probability that one juror would have found residual doubt at the penalty phase and thus spared Petitioner's life.  At a minimum, Petitioner's sentence should be overturned.

### CLAIM SEVENTEEN

**PETITIONER WAS DEPRIVED OF HIS FIFTH, SIXTH AND EIGHTH AMENDMENT RIGHTS TO TRIAL BY AN IMPARTIAL JURY AND DUE PROCESS WHEN THE TRIAL COURT DISMISSED A JUROR DURING PENALTY PHASE DELIBERATIONS BUT UPHELD THE GUILT PHASE VERDICT.  TRIAL AND APPELLATE COUNSEL INEFFECTIVELY LITIGATED THESE ISSUES.**

The Court's findings and handling of the incident related to Juror 523 was violative of a number of Petitioner's rights under the Constitution – not the least of which was this Court's finding that Juror 523 lied to the Court during its inquiry into the comments made by her employer.  In denying Petitioner's motion for a mistrial, this Court found that Juror 523 was not credible.  Yet, this Court failed to

89

act on this finding when it allowed the guilty verdict delivered by this Juror to remain standing.  The jury retired for penalty phase deliberations on Thursday, October 21, 2004.  The Court then "dismissed" the alternate jurors and instructed them to remain "on call" in case they were needed.  The alternates also were told not to discuss the case with anyone or to expose themselves to publicity about the case.  Tr., 3933-34.  On Thursday afternoon, after the jurors decided not to deliberate on Friday, Juror 523 approached the court staff "teary eyed" and "reported that she didn't feel comfortable going back to work [on Friday] because her boss was making inappropriate comments. . . ." *Id*. at 3944-45.  Specifically, he "would walk by her desk and say 'killer, killer, killer,' kind of whisper, and then he would also walk by and say 'fry him, fry him, fry him,' and he wouldn't say it directly to her, but he would walk by and whisper that in passing." *Id*. at 3945.

After questioning by the Court on October 21, 22 and 25, Juror 523 was dismissed and replaced with Alternate Juror 425, and the reconstituted jury was instructed to begin their penalty phase deliberations anew.  Post-trial, the Court conducted an evidentiary hearing on the defense's  motion for a mistrial.  At the hearing, the Government called six persons identified as officers or managers of

90

the company at which Juror 523 worked, each of whom was represented by counsel, and Petitioner called Juror 523 to testify.

In denying the mistrial, the Court concluded that Juror 523 was upset by the stress of her duties as a juror. *United States v. Honken*, 381 F. Supp. 2d 936, 1034 (N.D. Iowa 2005). Further, the Court found that Juror 523's boss did not make comments to the effect of "guilty, guilty, guilty," "fry him," or "when are you gonna fry him?" Instead, the Court determined Juror 523's testimony was inconsistent, and the only comment supported by credible evidence was "Juror 523 should have said something 'outrageous' to get out of jury duty." *Id*. at 1032. Ultimately, the Court found that:

> Juror 523 was troubled and upset by October 21, 2004 . . . by the stress of the duties of a juror in a capital case, coupled with the stress of changing "gears" to return to work when she was not in trial, and the fact that she had to go to work while other jurors did not, *all of which manifested in a desire to finish deliberations as quickly as possible and to "get her life back."*

*Id*. at 1034.

There was little evidentiary support for the Court's conclusions. Juror 523 never testified that she was stressed by her jury service. Rather, she testified that she was upset by the repeated improper comments from her boss when she returned to her place of employment. Further, her responses during voir dire did

91

not suggest that she would be stressed by juror service.  When asked whether she was capable of deciding guilt or innocence during voir dire, she responded "you bet."  Tr., 2935.  She also assured the Court that if she decided the death penalty was appropriate she had no reservations about "putting [her] name on a verdict form that would have the effect of causing somebody to be executed."  Tr., 2937.  Moreover,  Juror 523's testimony was not inconsistent.  Throughout the inquiry, Juror 523 maintained that her boss told her that Petitioner was "guilty, guilty, guilty."  If her testimony changed it all, it was to minimize the effect of her boss's comments on her ability to be impartial.  Tr., 4578-4600.

The Court of Appeals for the Eighth Circuit found that the trial court's inquiry into whether Juror 523 was affected her boss's comments was prohibited by Federal Rule of Evidence 606(b), which precludes questioning jurors as to the substantive effects of any outside influence.  *United States v. Honken*, 541 F.3d 1146, 1169-69 (8th Cir. 2009).  The Eighth Circuit conducted an objective assessment on the likelihood that the comment would affect a typical juror and concluded that it would not.  *Id*. at 1169.  Its decision, however, was based on this Court's findings of fact concerning Juror 523's credibility and what comments her boss made.  Because it is unclear the extent to which this Court's improper

questioning influenced its findings of fact, Petitioner is entitled to a full and fair evidentiary hearing that comports with the dictates of Rule 606(b).

Alternatively, assuming the Court's findings are correct, Petitioner's right to an impartial trial by jury was violated because the Court found that Juror 523 had not been truthful in her dealings with the Court. The Court found that Juror 523 falsely claimed that her boss made comments about Petitioner's guilt to "finish deliberations as quickly as possible . . . to 'get her life back.'" Juror dishonesty during voir dire may be the basis for granting a new trial. Here, Juror 523's apparent dishonesty during trial is even more damaging. She lied during deliberations and her lie – that Petitioner was "guilty, guilty, guilty" – revealed a strong bias against Petitioner. Further, the motive for her lie, to finish deliberations as quickly as possible, indicates that Juror 523 rushed to judgment and found Petitioner guilty for reasons other than the evidence presented.

Trial counsel were ineffective for failing to properly litigate this claim. Trial counsel argued that Petitioner's right to an impartial jury was violated because Juror 523 was tainted by an outside influence and argued that the Court's factual findings were incorrect. However, counsel failed to challenge the scope of the Court's evidentiary hearing and the impact of testimony from Juror 523 minimizing the effect of her boss's comments on her ability to be impartial on the

93

Court's factual findings. Moreover, counsel failed to challenge the validity of the guilt verdict in light of the Court's finding that Juror 523 lied to finish deliberations more quickly. There can be no reasonable strategic or tactical reason for this failure. Thus, despite being on notice of the issue, and despite the absence of any potential adverse impact of pursuing this set of objections, trial counsel failed to do so. But for counsel's failure, there is a reasonable probability that the outcomes of the guilt and penalty phases of Petitioner's trial would have been different. Petitioner's Fifth, Sixth and Eighth Amendment rights were violated. Relief is warranted.

Appellate counsel's performance also was deficient. The improper scope of the post-trial evidentiary hearing and, alternatively, Juror 523's dishonesty were plain error.[8] At the time of the direct appeal, it was standard practice that appellate counsel in capital cases should litigate all potentially meritorious issues. This standard was enunciated in case law extant at the time of the appeal. There was not, and could not be, any tactical or strategic reason for counsel not to raise this meritorious claim. Appellate counsel's failure to raise the issue prejudiced

---

[8]Appellate counsel did argue that the Court should not have relied on this inadmissible evidence in concluding that Juror 523 had not been prejudiced by her boss' comments. Counsel did not allege that the Court should not have relied on this evidence in making its factual findings.

94

Petitioner. The error was plain, and would have resulted in the appeals court vacating Petitioner's convictions, or, at a minimum, vacating his death sentences.

## CLAIM EIGHTEEN

**THE SECURITY MEASURES USED BY THIS COURT DURING TRIAL DENIED PETITIONER HIS RIGHTS TO A JURY TRIAL, TO THE PRESUMPTION OF INNOCENCE, DUE PROCESS, THE EFFECTIVE ASSISTANCE OF COUNSEL AND TO BE FREE OF CRUEL AND UNUSUAL PUNISHMENT AS GUARANTEED BY THE FIFTH, SIXTH AND EIGHTH AMENDMENTS.**

The Court put in place excessive security measures. The evidence presented by the Government in support of its request for the security measures came almost exclusively from compromised jailhouse informant witnesses. Since the Government suppressed exculpatory information regarding these witnesses (*see* Claim Three, above), the Court's decisions in this regard were not based upon a complete picture of the competency of this evidence. In any event, these security measures interfered with Petitioner's right to counsel and to a full and fair trial. They also impacted the jury, who were led to believe that Petitioner was an extraordinarily dangerous person – without competent evidence of such and where Petitioner's alleged dangerousness was at the core of the issues the jury would resolve. This, in turn, tainted both the guilt and penalty verdicts. To the extent that counsel knew about some of these measures and failed to fully object and

95

challenge the evidence, and to the extent that counsel could have uncovered some of the information suppressed by the Government, counsel were ineffective. Ultimately, Petitioner's right to fully confront this evidence was compromised.

The Court set in place various security measures based upon allegations by the Government. For the most part, these allegations were based upon information received from the jailhouse informant witnesses. None of these witnesses testified at the sealed hearing held prior to trial. Moreover, as established in *Claim Three* the Government failed to disclose information that would have undermined the veracity of these witnesses. Additionally, these measures were put in place without giving the defense an opportunity to challenge the allegations through cross examination of the jailhouse informants. The Court accepted the allegations and set in place onerous security measures that were unwarranted and unnecessary, and which prejudiced Petitioner in multiple respects.

For example, Petitioner was bolted to the floor at counsel table and was made to wear a stun belt. The defense objected and a hearing was held on the record, although sealed. The Court's subsequent decision was based almost exclusively on the testimony of Marshal Arechiga. He testified based on information he had been given by the Government that originated with the jailhouse informants. However, Petitioner was not given the opportunity to cross

96

examine those witnesses, because they were not presented at the hearing.[9] Counsel's failure to fully object and challenge this evidence was ineffective.

Additionally, Petitioner suffers from a severe impairment of his heart. Counsel were unaware of this because they never secured all of his medical records. Records show that he was treated for this condition as early as age fourteen. With his condition, the activation of the stun belt could very well have been fatal to Petitioner. This circumstance interfered with Petitioner's ability to consult fully with counsel and to participate in the litigation of his case.[10]

Additional onerous and unnecessary security measures were also put in place with respect to the jury that could have only had an objective and profound

---

[9]This Court found that some of this information was subject to adversarial testing at Petitioner's 1998 sentencing hearing and at the hearing pertaining to the anonymous jury. *United States v. Honken*, 378 F.Supp. 2d 1010, 1025-26 (N.D. Iowa, 2000). However, because the Government suppressed exculpatory information of which this Court was unaware, Petitioner did not have a full opportunity to confront this evidence.

[10]Petitioner notes that an issue regarding shackling was raised and rejected in his direct appeal. *United States v. Honken*, 541 F.3d 1146, 1163 (8th Cir. 2008). However, Petitioner alleges additional facts in this claim. Namely, that the decision to utilize the stun belt and to shackle him was based upon information from jailhouse informants that was not subject to adversarial testing and which was compromised by due process violations. Additionally, counsel failed to present evidence of Petitioner's severe heart problems as they relate to this issue.

97

impact on the individual jurors.[11]  For example, although the jury was not sequestered, the jurors met in a secret location each day.  They were then transported to the courthouse together under very tight security.  Upon arrival at the courthouse, they were ushered inside also under very tight security and were able to see snipers and other uniformed and armed law enforcement personnel in many areas in and around the courthouse.  Such drastic security measures were surely to have effects on the jurors' view of Petitioner and their analysis of the evidence – particularly during the penalty phase.  The Court's implementation of these enhanced security measures lent credence to the evidence presented through the jailhouse informants at trial, though Petitioner maintained then and now that the testimony was false.  This situation resulted in a violation of Petitioner's Fifth, Sixth and Eighth Amendment rights.  To the extent that counsel failed to object and fully litigate these issues, counsel were ineffective.  Petitioner was prejudiced by counsel's deficient performance as there is a reasonable probability that the enhanced security measures had a profound impact on the jurors and affected their ability to fairly consider the evidence.

---

[11]These facts are alleged by information and belief.  Petitioner requests a hearing on this claim and will be requesting permission to interview the jurors about these issues.

98

Appellate counsel were ineffective for failing to raise fully these issues on appeal. While counsel did raise this issue of the implementation of shackles and the stun belt, counsel did not raise it in terms of the constitutional violations alleged here. Additionally, since the Government suppressed exculpatory information regarding the jailhouse informants, this Court and the appellate court was not privy to all of these arguments.

## CLAIM NINETEEN

**COUNSEL WERE INEFFECTIVE UNDER THE SIXTH AMENDMENT FOR FAILING TO PROPERLY LITIGATE THE GOVERNMENT'S USE OF PSEUDO-SCIENTIFIC FORENSIC EXPERT TESTIMONY; IN THE ALTERNATIVE, NEW EVIDENCE ESTABLISHES THAT PETITIONER WAS CONVICTED AND SENTENCED TO DEATH ON THE BASIS OF INACCURATE AND UNRELIABLE EXPERT TESTIMONY IN VIOLATION OF THE EIGHTH AMENDMENT AND THE DUE PROCESS CLAUSE.**

The Government offered significant forensic expert testimony at Petitioner's trial in order to secure his conviction and death sentence. Defense counsel were ineffective for failing to adequately challenge this evidence. Alternatively, the landmark 2009 National Academy of Sciences Report (described herein) is new evidence that undermines Petitioner's convictions and sentences. The Fifth and Eighth Amendment require that flaws in the scientific presentation be remedied.

99

Counsel were ineffective under the Sixth amendment for failing to exclude, properly-cross examine, and/or rebut with defense experts the unreliable pseudo-scientific testimony introduced by the Government. The Government's forensic evidence at Petitioner's trial included: handwriting and questioned document evidence, DNA evidence, firearms and ballistics evidence, forensic pathology evidence, forensic dental evidence, and forensic anthropology evidence. All of this forensic evidence produced by the Government suffered from serious flaws in methodology and accuracy, and generally lacked a sound scientific basis. Counsel were ineffective for failing either to attempt to exclude this evidence pre-trial via a *Daubert* hearing, present contrary scientific evidence of their own, or, at a minimum, effectively challenge the Government's evidence through cross-examination. But for counsel's failings in this regard, there is a reasonable probability that the outcomes of the guilt and penalty phases of Petitioner's trial would have been different. Petitioner's Sixth Amendment rights were violated. In the alternative, new evidence establishes that Petitioner was convicted and sentenced to death on the basis of inaccurate and unreliable expert scientific testimony, in violation of his due process and Eighth Amendment rights.

On February 18, 2009, the National Academy of Sciences ("NAS") issued a landmark report regarding the state of forensic science in this country. *See* NAT'L

ACAD. OF SCI., STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD (Feb. 2009) (hereinafter "NAS" and "NAS Report"). The NAS is the preeminent scientific organization in the United States, and it was commissioned by Congress to study the forensic sciences and to issue this landmark report. The report represents new evidence that undermines the reliability of the critically important scientific testimony presented by the Government at Petitioner's trial to obtain a conviction and death sentence. In light of this new evidence, Petitioner's conviction and sentence are unconstitutional under the Eighth Amendment and the Due Process Clause.

## CLAIM TWENTY

### PETITIONER IS ENTITLED TO RELIEF BASED UPON THE CUMULATIVE IMPACT OF THE CONSTITUTIONAL VIOLATIONS DESCRIBED IN THIS *MOTION*.

Each of the above-described claims of constitutional error stand on their own and independently require relief. However, should this Court find error, but believe that individually they do not merit relief, the Court should consider the cumulative impact of the constitutional violations.

Petitioner will brief for this Court the principle that such violations must be viewed in such cumulative fashion. For now, Petitioner alleges that the cumulative impact of the errors requires a new trial and sentencing hearing.

101

**THE MANNER IN WHICH THE GOVERNMENT WOULD CARRY OUT PETITIONER'S EXECUTION WOULD VIOLATE THE EIGHTH AMENDMENT.**

Petitioner alleges that the manner of carrying out his execution would violate the Eighth Amendment to the United States Constitution. This constitutional violation would arise because of the combination of drugs to be used, the protocol governing the execution, the use of untrained non-medical and unqualified personnel and the physical space in which the execution would be carried out, would all result in the infliction of unnecessary pain and suffering in violation of the Eighth Amendment.

While Petitioner's belief that the execution under the current Bureau of Prison protocols would violate the Eighth Amendment, he acknowledges that this issue is not ripe at this time. Nonetheless, he raises it here, lest he be deemed to have waived any such challenge.

**REQUEST FOR RELIEF**

Based upon all of the above allegations and the entire record of this case, Petitioner respectfully requests that the Court provide the following interim and final relief:

A. That the Court require the Government to respond to the allegations made herein;

B. That the Court permit Petitioner to amend this Petition in accordance with law;

C. That the Court permit Petitioner discovery that will be requested in a subsequent motion;

D. That the Court permit Petitioner the opportunity to file appropriate memoranda in support of the relief requested herein;

E. That the Court conduct an evidentiary hearing on all disputed issues of material fact;

F. That the Court award final relief by vacating Petitioner's convictions and/or sentences, including his sentences of death.

103

Respectfully Submitted,

/s/ Michael Wiseman

Michael Wiseman
Shawn Nolan
Timothy Kane
Federal Community Defender
Eastern District of Pennsylvania
Suite 545 West – The Curtis Center
Philadelphia, PA 19106
215-928-0520

Counsel for Petitioner
Dustin Lee Honken

Dated:        December 13, 2010
             Philadelphia, Pennsylvania

104

**CERTIFICATE OF SERVICE**

I, Michael Wiseman, hereby certify that on this 13 day of December, 2010 I served the foregoing on the following person by ECF filing and by placing two copies in the United States Mail, postage prepaid, to the following:

C.J. Williams, Esq.
Assistant United States Attorney
United States Attorney's Office
Northern District of Iowa
401 First Street, S.E.
Hach Building, Suite 400
Cedar Rapids, IA 52401-1825

/s/ Michael Wiseman

_____

Michael Wiseman